## FRANK A. BONSAL *vs.* GEORGE W. YELLOTT, Etc., County Commissioners of Baltimore County, Etc.

*Constitutional Law—Works of Internal Improvement—Validity of Statute Making State Appropriation for Construction of County Roads.*

In the construction of a provision, which was first adopted in the Constitution of 1851 and continued in the Constitutions of 1864 and 1867, it is proper to consider the circumstances under which it was first adopted the object of its adoption, and the construction that has been placed on it by the Legislature, the framers of the several Constitutions and by the people.

The Act of 1904, ch. 225, appropriates from the State Treasury $200,000 annually to aid the different counties of the State in the construction and repair of public roads, the counties being required to pay one-half of the cost of the construction or repair, and afterwards to keep the roads in repair. Constitution, Art. 3, sec. 34, declares that the General Assembly shall not have "the power in any mode to involve the State in the construction of works of internal improvement, nor in granting any aid thereto, which shall involve the faith or credit of the State, nor make any appropriation therefor, except in aid of the construction of works of internal improvements in the counties of St. Mary's, Charles and Calvert, which have had no direct advantage from such works as have been heretofore aided by the State." This provision was first adopted in the Constitution of 1851 and was continued with slight changes in the subsequent Constitutions. The legislative and constitutional history of the State shows that large sums of public money had been lost by the State's investment in railroads and canals, and that it was the intention of the framers of the Constitution and of the people who adopted it to forbid the giving of aid to such works in the future. The contemporaneous and subsequent construction of the term "works of internal improvement," and the evident meaning of the term as used in other parts of the Constitution, all show that it was intended to apply only to those kinds of internal improvements, such as railroads and canals, to which the State had so given its aid. Consequently the construction or repair of public highways is not such a work of internal improvement as is within the constitutional prohibition and the Act of 1904 is valid.

Appeal from the Circuit Court for Baltimore County (Burke, J.)

The cause was argued before McSherry, C. J., Fowler, Briscoe, Page, Boyd, Pearce, Schmucker and Jones, JJ.

*William S. Bryan, Jr.*, and *Redmond C. Stewart*, for the appellant.

The language of the prohibition is clear and unequivocal, and includes all internal improvements, and nothing in the debates of the Constitutional Convention, which first adopted this provision, shows that the words were used in any but the ordinary sense; nor does the fact that the highways belong to the State affect the applicability of the prohibition to them. As the debates of the Constitutional Convention of 1851 show, the particular works of internal improvement which the convention sought to guard against, were the Baltimore & Ohio R. R., the Chesapeake and Ohio Canal, the Tidewater Canal and other railroad and canal companies. The State had subscribed largely to the stocks of these respective companies, with disastrous results, and the members of the Constitutional Convention determined not only to take away from the Legislature the power to aid or appropriate money for such internal improvements, but passed a broad and sweeping provision.

The unfortunate experience of the State with the railroads and canals undoubtedly brought about the intense feeling which culminated in the passage of the above provisions, but the prohibition in the Constitution is no more limited to railroads and canals than a reward for killing snakes would be limited to rattlesnakes. The members of the various Constitutional Conventions wished to forbid, and did forbid, the Legislature to use the funds belonging to the State for any and all works of internal improvement however beneficial for the good of its inhabitants they might seem.

While in the ten or fifteen years preceding the Constitutional Convention of 1850 the greatest attention was given to the development of the roads for steam cars by land and the roads through the water called canals, the roads for horse and foot passengers had received attention from the National and State Governments for over one hundred years, and they had been constructed and improved as the chief means of intercommunication between the various parts of the State and the country. In some cases the State had appropriated money or

the equivalent, for these works of internal improvement. The Act of 1774, ch. 21, provides for the issuing of bills of credit, creating a loan of $2,000 to inhabitants of Anne Arundel County, $10,666 to Baltimore County, and $8,000 to Frederick County, and providing for the re-payment of said bills of credit to be lent and issued to said counties; the charter of the turnpike road from Williamsport to Hagerstown, ch. 125, Acts 1832, provides in sec. 3: "That it shall and may be lawful for any incorporation or body politic in the State of Maryland, or any of the United States, or of the District of Columbia, to become stockholders in the said company, and hold stock therein," thus contemplating assistance to these works by the State—and the early history of this State in Colonial times, and up to the time when the thoughts and attention of the public were turned to the railroads and canals, shows that as far as was possible the State and the public sought to develop the highways and improve these internal improvements. See Chapter on Highway Legislation in Report on the Highways of Maryland, published by Md. Geological Survey, in accordance with Act of 1898, ch. 454.

No funds of any large amount were appropriated, simply because the State did not have any funds, and the National Government in 1806 took up the question of a National road, and on March 29th (ch. 19), Congress passed an Act to regulate the laying out and making a road from Cumberland, in the State of Maryland, to the State of Ohio. This Act appropriates $30,000 for the construction of the road, and subsequently the following sums were appropriated : On February 14th, 1810, $60,000; on March 3rd, 1811, $50,000; on May 6th, 1812, $30,000; on February 14th, 1815, $100,000; on May 15th, 1820, $10,000; on March 2nd, 1827, $30,000; on March 2nd, 1829, $50,000; on March 3rd, 1829, $100,000; on March 2nd, 1831, $75,000; making a total sum of $505,000 prior to 1834, when that part of the road which passes through Maryland was surrendered to it.

It is clear, therefore, that the expenditures of public funds for making internal improvements was well known and fre-

quently indulged in long before the railroads and canals became of such great interest to the State, and if in construing this provision we "consider the circumstances attending its adoption, and what appears to have been the understanding of those who adopted it" (*Bandel* v. *State*, 13 Md. 202), we find nothing in the constitutional debates of 1851 to show that the words "International Improvements" were used in any limited sense.   On the contrary, we find that almost all the members of the Constitutional Convention had the most intense feeling about the railroads and canals, and were determined to prohibit the Legislature from assisting or appropriating money for any work of internal improvement.    They did not approve of the State undertaking the development of its resources—the people, or the local government of the various sub-divisions of the State, would do this—the government was to be restricted to its purely governmental functions.    A discussion of the question will be found in vol. 1 of Debates of Maryland Reform Convention.

It is very evident, that the members of the Constitutional Convention of 1850, meant to use the words "internal improvement" in an ordinary usual sense, that is, the improvement of the internal condition of the State.   They of course, did not mean to prevent education, which is mentioned elsewhere in the Constitution, nor to limit the government in executing its governmental functions, such as providing a mansion for the Governor, a court house for the Court, an asylum for the indigent insane, a poor house for the paupers, institutions for the feeble minded, the sick and the poor; but when it came to building bridges, roads, railroads, canals, wharves, water works, draining lands or any of the many improvements possible to the internal conditions of the State, the Legislature was prohibited from assisting in appropriating any money therefor.

It is to be regretted that no reports of the debates of the Convention of 1867 exist, but as no change was made in the wording of the internal improvement sections, this makes little, if any difference, as evidently the matter was left where it was fought out in 1850.

New roads and railroads, while both practically are means of inter-communication for persons and freight, have one important difference. "The Highways" or public roads belong to the State, while the railroads do not. "The King's Highways" they were called in England, and the ultimate proprietary right in them is in the State. *Elliott on Roads and Streets*, 2 ed., sec. 423.

This admitted difference is the ground for the argument that they are not included in the constitutional prohibition. Public roads, it is contended, belong to the State, are part of the State, and if the sovereign power has the power, which is unquestioned, to provide that the respective counties shall have the power to construct and build roads and bridges, certainly it can spend its own funds on them.

The answer to this, we submit, is simple and clear. The Constitution of the State put only one limitation on the power of the State to deal with the highways that are its own, and that was not to appropriate money of the State for improving them. Suppose the State owned a railroad, and for the good of the people, desired to develop it, would the fact that it owned the railroad relieve it from being an internal improvement? That railroads and canals were not the only works of internal improvement that the makers of the Constitution had in mind, is shown by sec. 54 of the same Art. 3 of the Constition: "No county of this State shall contract any debt or obligation, in the construction of any railroad, canal, *or other work of internal improvement*, nor give, or loan its credit to, or in aid of any association or corporation, unless authorized by an Act of the General Assembly."

To the local sub-divisions of the State was granted the power to make internal improvements under very jealous safeguards; to the State the power was forbidden altogether.

We have looked in vain for any reasonable distinction between the railroads and canals, for which large sums were appropriated in 1850, and the highways of the State, for the improvement of which the Act of 1904, ch. 225, appropriated $200,000 annually, and we consider the Court's language in

*Smith* v. *Thursby*, 28 Md. 260, pertinent: "In construing the instrument, our duty is to interpret it, according to its language, where that is plain and unambiguous. We are not at liberty to conjecture what may have been the possible intention of its framers, not expressed in its language."

In construing the Constitution, as in construing every other written paper, we should give the instrument the meaning which the framers of it intended, and not the meaning which we may now think it would have been wiser or better for them to have intended. *The Queensbury Case*, 1 Bligh, 497; *Jones* v. *Smart*, 1 Term Rep. 51.

*John J. Donaldson* and *Osborne I. Yellott*, for the appellees.

That from the earliest times and in all countries one of the earliest, as it is one of the most vital, functions of organized government was the construction and maintenance of public means of communication is an historical fact we do not believe will be disputed. In Maryland, whose first colonists came from a land where from time immemorial public ways had been the "King's Highways," whose Lord Proprietor was by the charter invested with *jura regalia* in the Province, whose inhabitants by every Declaration of Rights from 1776 to 1867, are entitled to the Common Law of England and "also to all property derived to them from or under the Charter granted by His Majesty, Charles the First, to Caecilius Calvert, Baron of Baltimore," from the first settlement till today, this function, with its correlated powers and duties has always been exercised by the Proprietary or State Government, either immediately, or mediately through its delegates, the municipal and county authorities, or, during one part of the State's history, the turnpike companies. A thorough review by Mr. St. George L. Sioussat of the legislation, Provincial and State, relating to public roads, will be found in the Highway Report of the State Geological Survey (Baltimore 1899), pp. 109–186.

By this it appears that the first colonial Acts of Assembly dealing with public ways were those establishing ferries (*Op. cit.*, p. 111). From the first road law of 1666, to the last

session, laws innumerable have been passed by the General Assembly relating to public roads. Of these laws some have been general, some local; some among them have in terms *established* roads, others have left their establishment to local authorities.

With the notable exceptions hereinafter referred to, all of these Acts cast upon the local authorities the cost of maintenance and repair, in accordance with the common law doctrine of England by which the parishes, the local organs of the government, while having nothing to do with the establishment of highways, were yet charged with their repair.

In 1834, so much of the National Road, built by the United States, as lay within the boundaries of Maryland was transferred to the State, by it accepted (1834, ch. 203), and by the State held and maintained until 1878, when the counties through which it runs were given control of it (1878, ch. 158).

That, in the various laws passed dealing with public roads, some general, some local, the *establishment* of highways was sometimes left to the local authorities, their construction and maintenance almost always, so far from being an argument against the legislative power, is the strongest evidence of its existence.

The Maryland Constitution of 1776 and its amendments made no provision for county government, and until the adoption of that of 1850, the local authorities named in the various road laws, general and local, whether "Levy Court," "County Commissioners," "Road Commissioners" or others, were but the creatures of legislative enactment.

The first constitutional provision for county government is found in the Constitution of 1850, Art. 7, sec. 8, as follows: "The county authorities now known as Levy Courts or County Commissioners, shall hereafter be styled County Commissioners and shall be elected by general ticket, and not by districts, by the voters of the several counties. * * * *Said commissioners shall exercise such powers only as the Legislature may from time to time prescribe*, but such powers and duties * * * shall be uniform throughout the State," &c.

A like provision as to their powers and duties appears in the Constitution of 1864, and that of 1867 ordains (Art. 7, sec. 1). "Their number in each county, their compensation, *powers and duties, shall be such as now or may be hereafter prescribed by law.*"

It is therefore abundantly clear that such powers and duties as local authorities have had in Maryland, from the first settlement till today, in dealing with the public roads, including their construction and maintenance, the *levy and appropriation of taxes*, for the purpose, they had solely by delegation from the General Assembly.

Nor is any inference against the legislative power to be drawn from the turnpike legislation of the State (Highway Report, pp. 162–178), but, on the contrary it furnishes the strongest arguments for its existence. By every one of the turnpike company charters, beginning with the Acts of 1804, ch. 51, *public roads* were established. To the several corporations chartered was only given a *franchise*, viz : the right to collect tolls, in consideration of their bearing the cost of construction and repair. Not only did this Act provide that several of the companies were to take over public roads already existing, but it also provided (sec. 30) that the *State*, upon a certain notice, could take over the roads, upon paying compensation for the extinguished franchise, and later charters contained a like provision.

Some of the charters besides the provision of reverter to the State which seems to have been universal, contained a provision that the road established and to be constructed should "be forever thereafter a public road and common highway," *e. g.* The Washington and Baltimore Turnpike Road, 1812, ch. 78, sec. 11. While these were provisions inserted doubtless as a matter of abundant caution, they were, of course, merely declaratory, in view of the immemorial doctrine of the common law, "Once a highway, always a highway." Upon the expiration of a charter of a turnpike company, or its forfeiture as in the case of the Washington Turnpike (*Washington & Baltimore Turnpike Co.* v.

*State*, 19 Md. 239), the roads which had always been "public roads and common highways" of the State still remained so (but now discharged of the franchises theretofore granted respecting them), subject to all legislation applicable to such. *Dovaston* v. *Payne*, 2 H. Bl. 527; *Fawcett* v. *York Midland R. Co.*, 16 Q. B. 610; *Dawes* v. *Hawkins*, 8 C. B. N. S. 857; *State* v. *Main*, 27 Conn. 641, 71 Amer. Dec. 89; *Central Bridge Corp.* v. *Lowell*, 15 Gray, 106; *Com.* v. *Wilkinson*, 16 Pick. 175; *Graig* v. *People*, 47 Ills. 487; *Erie R. R. Co.* v. *Casey*, 26 Pa. St. 287; *N. C. R. Co.* v. *Com.*, 190 Pa. St. 300; *Pittsburg, &c.,* v. *Com.*, 190 Pa. St. 583; *State* v. *Lawrence Bridge Co.*, 22 Kans. 438; *State* v. *West, &c., Co.*, 95 N. C. 602.

We thus find from the earliest times the administration and control of highways a matter of legislative enactment, and so of their construction and repair. Generally this is carried out mediately through the delegates of the State Government, viz: the local and municipal authorities, or the turnpike companies under contract with the State.

The very breadth of the language first used in 1850 would indicate that "internal improvements" was meant in some special sense. Under the term could be included many things essential to the functions of government, such as jails, penitentiaries, court-houses, tobacco ware-houses, school-houses, even the State House and the Governor's mansion. ·There are, however, in the Constitution of 1850, other references that throw light on the use of the term in question, Art. 3, sec. 42; Art. 7, secs. 1, 2, 3.

In the Constitution of 1867, the references to internal improvements are quite as significant. Section 34 of Art. 3, which corresponds to sec. 22 of Art. 3 of the Constitution of 1850, and is that relied on by the plaintiff here, contains a like provision with regard to the application of the proceeds of the "Internal Improvement Companies." Article 12, dealing with the "Board of Public Works" after investing it with the general powers relating to the ·"Public Works" in which the "State may be interested as stockholder or creditor," in sec. 3, provides for the sale of the State's interest as stock-

holder and creditor in the Baltimore and Ohio Railroad Company and "the State's interest in the other *works of internal improvement*, whether as a stockholder or a creditor."

Another circumstance that goes to show the phrase was used in a special sense is that in the Constitution of 1867 it is capitalized "Internal Improvements" *wherever it occurs*, as was not done in the preceding Constitutions of 1850 and 1864.

Whatever was the sense, however, in which the term "internal improvements" was used in the Constitution of 1850 and 1867, they are at one in furnishing what, we respectfully submit, is a conclusive indication that the phrase was not meant to include "public roads and common highways."

By the Constitution of 1850 (Art. 7, sec. 8), as by that of 1867 (Art. 7, sec. 1), "County Commissioners" were provided for. Their powers and duties, however, were not defined, but were to be such as are "now, or may be hereafter prescribed by law." Accordingly it was and is within the competence of the General Assmbly to repeal all laws giving the county authorities the power to deal with the public roads; to levy and appropriate taxes for the same, and thus, granting for the moment the absence of legislative power, to deal *directly* with the matter, leave this earliest and foremost of governmental functions unfulfilled and unprovided for—a constitntional dilemma, we submit, quite as absurd as the suggestion that the General Assembly could delegate a power which it did not itself possess.

If the Legislature is so prohibited by sec. 34 of Art. 3, so are the counties by sec. 54 of the same Article (referred to later), without a *double* legislative authority, for "internal improvement" must be read alike in both places; so the dilemma remains. Looking, however, to the preceding history of the State and its legislation, the meaning of the constitutional prohibition (1850, Art. 3, sec. 22; 1867, Art. 3, sec. 34) becomes abundantly clear.

As we have seen, the General Assembly had at no time either during the Colonial period or after the Revolution made appropriations direct from the State treasury for the "public and

common highways." It had but once "given or loaned" "the credit of the State" in aid of them, viz: by the Act of 1774, ch. 21, under which Act of Bills of Credit issued by the State the small sums of $2,000, $10,666.66 and $8,000, were to be loaned to Anne Arundel, Baltimore and Frederick counties respectively. Here assuredly was not such legislative extravagance as called for a constitutional check. In the case of the National road, accepted from the United States Government by the State in 1834 and held directly by the State until 1878, there appears to have been no direct appropriation from the State treasury for its maintenance and repair. The State's appointed officers collected the customary tolls and applied them to these purposes. It is, therefore, not conceivable that the constitutional prohibition was dirceted against State aid to public roads.

There were, however, other "internal improvements" that then and for many years before occupied a great space in public interest, leaving a profound mark on the economic and financial history of the State, as well as on its legislation.

In 1794 was passed an Act (1794, ch. 33), "for etablishing a company for opening and extending the navigation of the river Patowmack." This provided (sec. 20) for a subscription by the State to the stock of the company. By the Act of 1795, ch. 51, the State was to make an additional subscription.

In 1824 was passed an Act incorporating the Chesapeake and Ohio Canal Company (1823, ch. 140).

In 1826, was passed an Act entitled "An Act for the Promotion of Internal Improvement" (1825, ch. 180), the first of many bearing such a title. This authorized a subscription on behalf of the State to the Chesapeake and Ohio Canal, the Maryland Canal (chartered by this Act) and a canal from Baltimore to the Snsquehanna river, and made an appropriation for the improvement of navigation of certain rivers of the State.

The phrase "internal improvements" seems, however, to have been first used in an Act of the same session (1825, ch.

166), approved two days earlier, entitled "An Act to create a Board of Public Works," a body given constitutional standing by the Constitution of 1850 and its successors.   At that time canals had long been looked to as a great advance in methods of communication, but the success of Stephenson's experiments in England had demonstrated that there was another means, pregnant with even greater possibilities.   Some short lines of railroads were already in operation in the United States, and their construction in Maryland was already a matter of discussion.   The preamble of the Act runs.  "*Whereas*, It is the opinion of this General Assembly, that the prosperity of this State would be quickened and better assured by the creations of a Board of Public Works, whose duty it shall be to form and propose plans of *internal improvement* by means of roads and canals, to superintend the execution of such, as the Legislature may approve and authorize; to devise and suggest the ways and means necessary to complete the same; and generally to take under their care and control the stock or property which this State does and may possess in these improvements."

In February, 1827, was passed the first railroad charter, that of the Baltimore and Ohio Railroad Company (1826, ch. 123).   This provided for a large State subscription to the stock of the company.

From that time on were passed many Acts incorporating railroad companies, and providing for State subscriptions and loans to the same, and many others providing for State subscriptions and loans to canal companies.

So there were many Acts relating in terms to "internal improvements," *e. g.*

1827, ch. 104, entitled "A Supplement to the Act, entitled, an Act for the promotion of internal improvement."

1828, ch. 192, repealing a proviso of "An Act for the promotion of public improvement."

1830, ch. 158, entitled "An Act to promote internal improvement by the construction of railroad from Baltimore to the city of Washington."

1831, ch. 251, entitled "An additional Supplement to the Act entitled an Act for the promotion of internal improvement."

1831, ch. 33, entitled, "A Supplement to the Act entitled, an act for the promotion of internal improvement by the construction of a railroad from Baltimore to the city of Washington."

1832, ch. 175, entitled "A further Supplement to the Act entitled an Act to promote internal improvement," &c. (Wash. Branch). See also 1833, ch. 33; 1833, ch. 105; 1833, ch. 170; 1835, ch. 395; 1837, ch. 314; 1837, ch. 337; 1837, ch. 357; 1838, ch. 179; 1838, ch. 386; 1840, ch. 260.

We refer so fully to these Acts of Assembly because, with the one next noted, they are all and the only ones we have been able to find dealing with "internal improvements." From first to last they have to do with *canals* and *railroads*, and subscriptions and loans by the State to the same. In none of them was there any aid by the State provided for "public roads," nor are they even referred to in these Acts. The Act of 1774, ch. 21, loaning State bills of credit to certain counties in aid of public roads therein still remained, as it is today, the only instance of *direct* aid from the treasury of the government, Provincial or State, to public roads.

By 1840 the State debts had been increased by millions by reason of its subscriptions and loans to canal and railroad companies under their charters and the various Acts "for the promotion of internal improvement." The annual interest charge had become an almost intolerable burden. None of the "internal improvements" had come up to the sanguine expectations with which they had been entered upon. They none of them were producing such revenues as gave promise of early relief to a failing treasury. It was felt that something must be done. In March, 1843, was passed an Act (1842, ch. 301), entitled "an Act to sell the State's interest in the internal improvement companies, and to pay the debts of the State."

This Act proved nugatory. The State's interests were unsaleable, the State debt remained undiminished and the usual

taxes were insufficient to meet the annual interest charges. The expected crisis was not long in coming. The State defaulted on its interest and stood face to face with bankruptcy and repudiation. After a time of the gravest financial distress and great popular agitation, however, the situation was saved by the patriotic efforts of some of the citizens of the State. After a memorable struggle, the Legislature of 1846–7 passed laws imposing additional taxes to meet the overdue and accruing obligations of the State. These were met in full and the State's credit finally re-established.

. It was after such a bitter experience that the Constitutional Convention of 1850 met, and all its deliberations are colored by it throughout. The provisions we are considering (1850, Art. 3, sec. 22), is its direct outcome, as is but too clear from every part of the debates in which it is dealt with. 1. Debates Constitutional Convention 1850, pp. 325, 340–354, 356–371, 375–378, 411–419, 420–423, 442–446. 2. 339–347.

In all these discussions there is no reference to *public roads*, and for the best of reasons. The General Assembly had never indulged in reckless extravagance in aid of them and there was here no supposed evil to check by constitutional prohibition. There was, however, a very real evil to be met, *the limitless expenditure on canals and railroads* ("internal improvements") and this is the text of every speaker.

In the Constitution of 1864 (Art. 3, sec. 33), the provision in question was taken *totidem verbis* from that of 1850, without comment or discussion in the convention.

In the Constitutional Convention of 1867 there was no official report of the debates. From the very full reports of its proceedingss in the Baltimore "Sun" of the time it appears that the provision now under discussion being like that contained in the Constitutions of 1850 and 1864, was reported, with the significant changes already noted by the Committee on the Legislative Department, and adopted without debate or dissent. Such also is the recollection of living members of that convention. That this section should have passed *sub silentio* in 1864 and 1867 was natural enough. The reasons

for the provision were still quite as potent as in 1850, but then had been set out at large once for all, and were not only still within memory, but in permanent form in the official debates of the convention of that year.

The amendments, however, made without discussion in the convention of 1867, make plain what was in mind in the use of the words, "internal improvements." The words "any enterprise," used 1850, are cut out, and most pregnant circumstance of all, the proviso is added allowing legislative aid not exceeding $500,000 for the "construction of works of internal improvement, in the counties of St. Mary's, Charles and Calvert, *which have had no direct advantage from such works, as have been heretofore aided by the State.*" (1867, Art. 3, sec. 34.)

Nothing could be clearer than the reference here to the various canals and railroads which had received subventions from the State—the only class of "internal improvements" that had been so aided, save in the one instance under the Colonial Government of the loan of State bills of credit to a a small amount to certain counties for public roads (1774, ch. 21). Again, it could not have been said that from public roads the counties named "had received no direct advantage." Being among the first settled, these naturally were among the earliest in which public roads were established. Highway Report, pp. 112–113.

In 1867 appears for the first time a provision limiting the power of counties (1867, Art. 3, sec. 54), to contract "any debt, or obligation, in the construction of any railroad, canal, or other work of internal improvement." By the rule of construction so well established, the general words here used must be restricted to subjects of the same *genus* as those specifically named, *Maxwell on Statutes*, 55, 297, a class that surely cannot be made to include "public roads and common highways." Besides that such are not here included, we have an unbroken construction both popular and legislative from 1867 till now. Again and again the cities and counties of the State have "contracted debts and obligations" for the improvement and construction of streets and public roads without following the re-

. quirements of this section. *To construe this section otherwise would strike down all street and road legislation for city and county that has been passed since 1867.*

If then, our construction of sec. 54 be correct, as we think cannot be disputed, and the phrase "internal improvements" has this meaning here, it must be taken to have the same where elsewhere used in the Constitution. *Roberts* v. *Gibson,* 6 H. & J. 116, 124–5.

BOYD, J., delivered the opinion of the Court.

The appellant filed a bill in equity against the appellees in which he sought to enjoin them from expending any of the public funds under their control, for plans and specifications for the construction of any road under the provisions of the Act of 1904, ch. 225, and from making any other expenditures of such public funds under color of the provisions of that Act. The appellant is a resident and taxpayer of Baltimore County, and the appellees are the County Commissioners, sitting as the Highways Commission of said county. The Act of 1904 is entitled "An Act for the improvement of the public highways of the State and to provide the means therefor, and to require the commission created by an Act of the General Assembly of 1896, ch. 51, to perform certain additional duties." By it, it is proposed to furnish State aid for the construction of roads which may be macadamized, or of a telford or other stones, or constructed of gravel or other good material "in such a manner that the same will be, with reasonable repairs thereto, at all seasons of the year, firm, smooth and convenient for travel." It appropriates the sum of $200,000 annually, or so much thereof as may be necessary, out of the State treasury, and provides that the State shall pay not exceeding one-half of the total cost and expenses of the roads built according to its provisions. The counties are to pay the other half and no county is to receive a larger share of the amount appropriated than the proportion the public road mileage of the county bears to the total public road mileage of all the counties in the State applying, as de-

termined by the commission. Any road constructed under the Act is to be thereafter a county road and the duty of keeping it in repair devolves upon the county. The commission provided for by the Act of 1896, and referred to in this Act, is composed of the Governor, the Comptroller, the president of Johns Hopkins University, and the president of the Maryland Agricultural College, and it has various duties to perform under the provisions of the statute.

The question is whether this Act is in conflict with that part of sec. 34 of Art. 3 of the Constitution of the State, which is as follows: "The credit of the State shall not in any manner be given or loaned to, or in aid of any individual association or corporation; nor shall the General Assembly have the power in any mode to involve the State in the construction of works of internal improvement, nor in granting any aid thereto, which shall involve the faith or credit of the State; nor make any appropriation therefor, except in aid of the construction of works of internal improvements in the counties of St. Mary's, Charles and Calvert, which have had no direct advantage from such works as have been heretofore aided by the State; and provided that such aid, advances or appropriations shall not exceed in the aggregate the sum of five hundred thousand dollars." The first provision of this character that was adopted in this State was in sec. 22 of Art. 3 of the Constitution of 1851. It was similar to that in the present Constitution, excepting instead of using the expression "nor in granting any aid thereto, which shall involve the faith or credit of the State," it said, "or in any enterprise which shall involve the faith or credit of the State," and no exception was made in favor of the three counties named. The Constitution of 1864 followed the language of that of 1851.

Inasmuch then as the provision in controversy was first introduced in the Constitution of 1851, and was continued in that of 1864 and, with such changes as we have noted, in that of 1867, it will be proper to consider the circumstances under which it was first adopted, the object of its adoption and the construction that has been placed on it by the Legislature,

the framers of the several Constitutions and by the people. Questions of this chacacter cannot be determined by simply ascertaining the etymology of the terms used. Public roads may be, and unquestionably generally are, "internal improvements," but when the General Assembly has been prohibited for more than half a century from, in any mode, involving the State in the "construction of works of internal improvement, or granting any aid thereto which will involve the faith or credit of the State, or making any appropriation therefor," the question is not whether that term *can* include "public roads," but whether it was *intended* to and *did* do so, as used by the framers of the Constitution and the people who adopted it. As was said in *Jackson* v. *State*, 87 Md. 194, "The Constitution is not to be construed in a technical manner, but in ascertaining its meaning we are to consider the circumstances attending its adoption, and what appears to have been the understanding of the people when they adopted it," and we then only announced a rule of interpretation which had been frequently adopted.

It is only by recalling, what seems almost like ancient history to us of today, that there was a time when the State's credit was seriously affected that we can appreciate the occasion for such a provision as the one under consideration. Yet we find the same Legislature that passed this Act recognizing the great public services rendered by a former Governor of Maryland in preseving its credit, not long prior to the assembling of what was called "The Maryland Reform Convention to Revise the Constitution." From the debates of that convention and other history of the State, it is well known that it had expended millions of dollars in aiding "works of internal tmprovements," which in some instances proved to be worthless investments and in others giving little or no promise of early returns. But they were canals, railroads, possibly turnpikes, and similar internal improvements, and so far as the records disclose, or we are informed, not one dollar of the State's money had been lost or was in any jeopardy by reason of aid to such "public roads" as we are now concerned in.

With the exception of about twenty thousand dollars, in the aggregate, loaned to three counties, by the Act of 1774, ch. 21, we have not been cited to any instance where its credit had been involved for the benefit of "public roads," and indeed that was whilst Maryland was still a Colony.   It was said by the appellees, and does not seem to be denied by the appellant, that that Act "is the only instance of *direct* aid from the treasury of the government, Provincial or State, to public roads."   But be that as it may, certain it is, as clearly shown by the debates of the convention, that the "works of internal improvement" which had been and were then giving the people of this State such concern, were the Baltimore & Ohio Railroad, the Chesapeake & Ohio Canal, the Tidewater Canal, and similar companies in which the State's money had been so largely invested.  Such enterprises were being aided, not only. for the purpose of developing the State, but the Legislature had doubtless been made to believe that they would be profitable investments.   But the time came when the State could not meet the interest on its debt, incurred by reason of these investments, and it was in danger of bankruptcy and repudiation.   The Legislature passed "An Act to sell the State's interest in the internal improvement companies, and to pay the debts of the State" (1842, ch. 301), but they could not be sold for want of purchasers, and finally after a great struggle the obligations of the State were met by increased taxation, and its credit re-established.  When then the constitutional convention of 1851 submitted to the people this provision, it is certain that its members and the people had in mind the character of "internal improvements," which had been so disastrous to the State, and it would seem to be equally clear that they did not refer to the ordinary "public roads," which the public authorities alone construct.

We are not called upon to attempt to give the history of highway legislation in Maryland.   An article of much interest is found in vol. 3 of "Maryland Geological Survey," and the briefs filed in this case can be studied with profit.  It must suffice to say that with the exception of the National road,

built by the general government from Cumberland westward, the turnpike and plank roads, constructed by private corporations chartered by the State or by individuals, the public roads have been constructed almost, if not altogether, exclusively by the local authorities. We followed that rule of the common law, with others. But while that is so, it is equally true that no power of taxation, or other means of raising revenue for the construction and maintenance of roads, is vested in the counties, excepting what the State gives them. "Cities and counties are but local divisions of the State, organized and chartered for the more efficient and economical administration of the government. As such, they have no inherent power of taxation. The Legislature itself may levy needful taxes to defray the general expenses of such cities or counties, or it may delegate this power to the local authorities. These expenses of a city or county, for example expenses for   *   *   *   the maintenance of the public highways and other like expenses, are *public* or *governmental* expenses, and *the power of taxa-tion, exercised by the local authorities, to defray such expenses, is a delegated power derived' from the Legislature.*" *Daly* v. *Morgan*, 69 Md. 467. Under our present system the County Commissioners are the boards in charge of the local affairs of the counties, and by sec. 1 of Art. 7 of the Constitution "their compensation, powers and duties shall be such as are now or may be hereafter prescribed by law." Under the Code of Public General Laws (Art. 25) they have charge of and control over county roads and bridges, have the power to open, alter or close public roads in their respective counties, and are required to keep them in repair. But the Legislature can so change their power and duties as 'to the public roads as to place them under the control of another board as was done in Baltimore County, where they were put in the hands of Roads' Commissioners, and the statute was upheld by this Court to the extent of relieving the County Commissioners from liability for damages for injuries sustained by reason' of a road being out of repair. *Baltimore County* v. *Wilson*, 97 Md. 207.

Such being the case, it would seem strange if the people did mean by this provision in the Constitution to deprive the Legislature of the power to aid in the construction of county roads. It may well be that such assistance by the State as is proposed by this Act may be the means of enabling the counties to construct roads of a character that no 'one county could well undertake. A State commission, such as that provided for, may be able to introduce a system and methods that the local authorities of one county could not be expected to undertake. Yet, if the contention of the appellant is correct, there not only could not be a commission paid by the State to help the counties in this work, but even one such as this would be unlawful for although the Act of 1896, which created the commission, requires the members to serve without compensation, it provides that they shall be reimbursed for actual expenses incurred, and there are expenses connected with their duties other than those personal to the members of the commission, which must be met. Indeed can it be doubted that much of the work already done in connection with the "Maryland Geological Survey," is in conflict with this provision of the Constitution, if the construction contended for must be placed on it? On p. 38 of vol. 1 of the reports of that survey, attention is called to "The Special Investigation of Road Materials." After referring to the fact that perhaps no subject is attracting more attention "of enlightened commonwealths," than the proper construction of roads, "that if the money now expended annually by the several States was properly applied, a system of permanently good roads could be gradually constructed in place of the temporary makeshifts now in vogue," the importance of showing to the Road Commissioners of each county the various rock formations within the State, the most available local materials, questions of transportation of them, etc., that page concludes, "There are few ways in which the Geological Survey can be of more direct service to the State than in giving advice regarding the proper materials for road construction, and it is the intention of the State Geologist to give the subject his careful attention as the work of the survey pro-

ceeds." One entire volume (3) of these reports is devoted to this subject, and in other ways the money of the State has been used in aid of these "internal improvements," but is it to be suggested that the framers of our three Constitutions containing this provision ever dreamt that they were so effectually sealing the doors of our State Treasury as to prevent the expenditure of any of its money for such purposes? Every intelligent person in the State, who has given the work of this commission, and the officers and others employed by them, due consideration, must know that the public money has seldom been more advantageously spent for the development and advertisement of the State, and for the instruction of its people in matters that must be of the most practical and permanent benefit. Yet it cannot be doubted that if the appropriation made by the Act of 1904 is in conflict with the Constitution, the expenditure of all money heretofore expended by the officers of the Maryland Geological Survey for the benefit of the highways has likewise been so, for it would be an anomaly to say that the General Assembly cannot aid in the actual construction of the public roads, but can aid in finding, developing and testing the material for such roads, in instructing the county officials how to make roads, etc. Of course we are aware that it would not justify the expenditure of the money under the Act of 1904, to show that other money of the State had been used in connection with public roads, but we refer to this to show how far the contention of the appellant would require us to go, if adopted, and as we have no doubt about the authority of the officers of the Maryland Geological Survey to give such assistance to the counties as we have referred to, it reflects upon the question now before us.

One way of ascertaining the meaning of a word, term or expression as used in a Constitution, sanctioned by this and other Courts, is to see how it is used in other connections and provisions in the same instrument. The concluding part of this prohibition of the present Constitution throws considerable light on the subject—"except in aid of the construction of works of internal improvement in the counties of St. Mary's,

Charles and Calvert, which have had no direct advantage from such works as have been heretofore aided by the State." What "Works" had been therefore aided by the State? We have seen that the State had not aided such works as "public roads," but it had aided railroads, canals, etc., such as we have said the framers of the Constitution had in mind. If it was intended to equalize those counties with the others, manifestly it was intended to do so by aiding them in "such works" as the State had aided the others. It did not intend simply to make a donation to those three counties of half a million dollars, but that they should "have such aid, advances or appropriations" as had been given or made, which had directly benefited the other counties. That such was the legislative construction is shown by the significant fact that at the first session of the Legislature it passed "an Act to aid in construction of works of internal improvements in St. Mary's, Charles and Calvert Counties" (Act of 1868, ch. 454), in which this provision of the Constitution was referred to and, in the preamble, it was stated that "said counties have heretofore received no direct benefit from works heretofore aided by the State." The amount was then apportioned between the three counties and the State Treasurer was authorized to subscribe to the capital stock "of any railroad company now chartered or which may hereafter be chartered in said counties respectively"—thus conclusively showing that the members of the Legislature who were elected a few months after the Constitution was adopted construed the provision as contended for by the appellees.

Another provision of the Constitution which reflects on the subject is sec. 54 of the same Art. (3). That provides that "No county of this State shall contract any debt, or obligation, in the construction of any railroad, canal or other work of internal improvement, nor give or loan its credit to, or in aid of any association or corporation, unless authorized by an Act of the General Assembly," which must be published for two months and then be approved by a majority of all the members elected to each House of the next General Assembly.

If the construction urged by the appellant be correct, a county could not incur a debt or obligation to construct a road, or build a bridge, without first complying with these provisions. It has happened in some portions of the State that a road as originally constructed has been so completely destroyed as to require building a new one for some distance, over other lands, and although bridges are included in the general term "internal improvements," it is not unusual, in some portions of the State, for them to be carried off by floods. If a county meets with such disaster by reason of high waters, such as some of them did in 1877, 1889, and other recent years, although a duty to replace rests upon it, nothing could be done for two or more years, depending upon when the disaster overtook it. Such a construction would be contrary to the practice of most, if not all, of the counties, and it would in some counties ruin many of the inhabitants if they are to be thus cut off from markets and other places they must reach for such length of time. Counties have frequently contracted large obligations in the original construction of roads and bridges without attempting to comply with the provisions of this section. The Legislature has over and over again passed laws requiring County Commissioners to build bridges and directing the issue of bonds. Sometimes it has authorized the issue of bonds for the purpose of building new roads and, so far as we are aware, it has never been the practice in such cases to comply with the provisions of sec. 54 of Art. 3 of the Constitution, as it was not thought to be necessary, either by the members of the Legislature, the Governors and Attorney-Generals passing on such Acts, the county officials or by the people at large. It would be unreasonable, therefore, to suppose that the framers of the Constitution, or the people who voted on it, ever intended to give such a construction to the term "works of internal improvement," and if it was not so intended as to the counties, why was it as to the State? If "works of internal improvement" in sec. 34 include "public roads," of the character in question, why does not that term have a similar meaning in sec. 54, of the same Article? Yet it has never been so un-

derstood and would be contrary to all precedents to so construe it.

Still other expressions are to be found in the Contitution of the State showing that the meaning of this term is not such as the appellant urges. In this same section the Legislature is forbidden to "use or appropriate the proceeds of the internal improvement companies;" in sec. 42 (of 1851) it was made the duty of the Legislature, as soon as the public debt was paid, "to cause to be transferred to the several counties and the city of Baltimore stock in the internal improvement companies;" in sec. 3 of Art. 12 of (1867), the Board of Public Works was authorized to exchange the State's interest in the Baltimore and Ohio Railroad Company and "to sell the State's interest in the other works of internal improvement, whether as a stockholders or a creditor," and now by that section, as amended in 1891, "to sell the State's interest in all works of internal improvement, whether as a stockholder or creditor." In 1867 the State owned, exclusive of the counties, the National Road within its boundaries and it was undoubtedly a "public highway," but can it be supposed for a moment that it was a "work of internal improvement," within the meaning intended to be given that term in the Constitution—either in sec. 3 of Art. 12, or in sec. 34 of Art. 3? And do not these several provisions of the Constitution show conclusively that the "works of internal improvement" intended were such as the State had been connected with or interested in as "stockholder," or "creditor"—such as had driven it to the very verge of bankruptcy and repudiation—and not such as every State government must have, either in its own name or in the names of its "political agencies, created for the better government of the affairs of the State," which counties are said to be in *Queen Anne's County* v. *Talbot County*, 99 Md. 13.

The learned counsel for the appellees have quoted the titles of many Acts of the General Assembly, passed prior to the adoption of the Constitution of 1851, which strongly indicate the meaning of the term, as used by the Legislature during the period this State was becoming interested in "internal improve-

ments." They are such as "an Act for the promotion of internal improvements," "a Supplement to the Act entitled 'an Act for the promotion of internal improvements;'" "an Act to provide ways and means to meet the subscriptions on the part of the State to works of internal improvements," and many others. It will be seen by an examination that in most of them provision was made for subscription by the State to the stock or bonds of railroads, or canals, or both, the issue of certificates of stock of the State and other means to aid these "internal improvements.' An examination of these and similar acts cannot fail to strengthen the conviction that the makers of our Constitutions, and the people who by their action made them effective, had in mind such internal improvements as those Acts have reference to, and not such as public roads.

It is difficult to do full justice to this subject in an opinion of anything like reasonable length, and we do not desire to unnecessarily prolong this, important as we realize the subject to be. We fully appreciate the importance and, under some conditions, the necessity of curbing the tendency to make too free use of the public funds, or the credit of the State. This provision in the Constitution is a wise one, and perhaps has at times saved the State from becoming interested, not to say involved, in what might well be deemed questionable enterprises for a State to embark in. Nor have we any doubt that a public highway is an "internal improvement" (as indeed in a sense the term may include the State House, the Court of Appeals Building, the Penitentiary, House of Correction, Reformatory Institutions, Hospitals, and the like, including the improvements of the grounds appurtenant thereto, and the roads and ways leading to them), but we are convinced that the term "works of internal improvement," as used in this section of the Constitution, was not intended to and does not embrace the "public highways" contemplated by the Act of 1904. The occasion for such provision, the discussion of the subject in the convention that first adopted it, the context, the evident meaning of the term in other parts of the Constitutions, the

prior, contemporaneous and subsequent construction of the term, all suggest this as the reasonable and proper meaning to be given to it by the Courts. Then when we add to those considerations the additional one that by the same Constitution which first adopted this provision it was provided that the County Commissioners "shall exercise such powers and duties only as the Legislature may from time to time prescribe," and by the present one their "powers and duties shall be such as now, or may be hereafter prescribed by law," we are strengthened in our conviction. For, as was well said in appellees' brief, "The establishment, construction and maintenance of public roads is a primary function of government," and when we remember that a county is but a division of the State, "created and organized for public political purposes connected with the administration of the State Government," and that the Legislature has, under the power given it by the Constitution, imposed the duty on the County Commissioners to raise money with which the public roads can be maintained, it would seem remarkable, if not unjust to the counties, if the Legislature was intentionally shorn of the power to give such reasonable aid to the counties towards the construction or improvement of public roads as this act contemplates. The General Assembly exercises great power over the counties and in no respect more than concerning their public roads and bridges, as illustrated in the cases between Queen Anne's County and Talbot County in 50 Md. 245, and 99 Md. 13, the *Baltimore County Road case, supra,* and by the Act of 1878, ch. 158, by which it required Allegany and Garrett Counties to take charge of and keep in repair the National Road. Yet if the appellant's contention is right, it cannot aid these "political divisions of the State, organized with a view to the general policy of the State," as was said of counties in *Daly v. Morgan,* "although they are constantly subject to legislative control," however desirable for the State at large it may be to do so. It cannot be doubted that in the absence of some constitutional prohibition the General Assembly has full power to furnish such aid, and when we are called upon to determine whether

a recognized and unquestioned power has been taken from a body, such as the General Assembly, in which it was formerly vested, any doubt on the subject should be resolved in favor of its continuance, rather than against it—especially when it concerns a subject in which the State has so much interest as public roads.   Rules of interpretation adopted by the Courts require them to sustain legislation when it can properly be done, and Courts should be inclined to continue the powers formerly vested in the General Assembly unless there be manifested a clear, unquestionable intent to take them from it.

Being of the opinion that the Act of 1904, ch. 225, is not in conflict with sec. 34 of Art. 3 of the Constitution, as the term "works of internal improvements" as therein used was not intended to apply to such public highways of the State, as are constructed by the counties, and contemplated by that Act, the decree of the lower Court so holding will be affirmed.

*Decree affirmed, costs to be paid by the*
*appellant.*

(Decided March 22nd, 1905.)