# Staunton

### C. F. JOYNER, JR., COMMISSIONER, ETC. v. CENTRE MOTOR COMPANY, INC.

September 5, 1951.

Record No. 3810.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*J. Lindsay Almond, Jr., Attorney General, D. Gardiner Tyler, Jr., Assistant Attorney General,* and *Edward L. Breeden, Jr.,* for the plaintiff in error.

*M. B. Wagenheim* and *George H. Gray,* for the defendant in error.

*W. R. Ashburn,* amicus curiae.

MILLER, J., delivered the opinion of the court.

This litigation arose out of the refusal of the Commissioner of the Division of Motor Vehicles of Virginia to issue to the Centre Motor Company, Incorporated, hereinafter referred to as the Company, a license that would permit it to sell new motor vehicles.

For several years the Company has been engaged in the purchase and sale of motor vehicles in the city of Norfolk, Virginia, where it maintains its office and place of business. It holds no contract or franchise with any manufacturer, distributor, or dealer authorizing it to sell new motor vehicles of any make. However, on July 18, 1950, it applied to the Commissioner for a license which would authorize it to sell new and used vehicles. The application was refused because of certain pro-

visions of an act of the General Assembly of 1944, ch. 406, p. 637, which, as amended, now appears as sections 46-502 to 46-540, inclusive, of the Code of Virginia, 1950. These sections of the Code define what is a new or used motor vehicle and a new or used motor vehicle dealer, provide for the issuance of licenses to deal in new and used vehicles, and make it unlawful for any dealer to sell new motor vehicles unless he is authorized to do so by a written contract with the manufacturer, distributor or dealer of a particular make of vehicle.

The pertinent parts of Code sections 46-503, 46-522, and 46-535, upon which the Commissioner based his right to refuse the application follow:

Section 46-503—"1. (1) (a) 'New motor vehicle' means a motor vehicle which has been titled thirty (30) days or less in other than its manufacturer's or licensed new motor vehicle dealer's name or has not been driven more than five hundred (500) miles.

"(b). 'Used motor vehicle' means a motor vehicle other than described in paragraph (1) (a) above.

"(3) 'New motor vehicle dealer' means a motor vehicle dealer who buys, sells or exchanges or offers or attempts to negotiate a sale or exchange of an interest in, or who is engaged, wholly or in part, in the business of selling, new and used motor vehicles.

"(4) 'Used motor vehicle dealer' means a motor vehicle dealer who buys, sells or exchanges, or offers or attempts to negotiate a sale or exchange of an interest in, or who is engaged, wholly or in part, in the business of selling, used motor vehicles only."

"46-522. Grounds for denying, suspending or revoking licenses. A license may be denied, suspended or revoked on any one or more of the following grounds. * * *

"(4) Being a new motor vehicle dealer, engaging in the business of selling at retail any new motor vehicle without having authority of a written contract or franchise with the manufacturer or authorized distributior of that particular make of new motor vehicle. * * *"

"46-535. Manufacturer or distributor franchise. It is unlawful for any motor vehicle dealer to sell or offer for sale any new motor vehicle unless he shall have a written contract or franchise with the manufacturer or authorized distributor or dealer of that particular make of new motor vehicle."

The Company deemed itself aggrieved by the refusal of the Commissioner to issue the license applied for and appealed to the circuit court as provided for in the Act.

The evidence before the trial court disclosed that the Company has been engaged in selling motor vehicles for about five years. It maintains a well-equipped establishment, sales room and repair shop, and its plant and facilities meet all statutory requirements for such an undertaking. They are more adequate and better than those of the average enfranchised dealer in this State.

Of the motor vehicles that have been sold by the Company in the past, about eighty per cent of them measure up to and meet the definition of a new vehicle as defined in section 46-503. When there is no shortage of automobiles, the Company usually acquires those cars from enfranchised dealers in other localities who are overstocked. When this condition obtains in the market, most of its cars are brought from enfranchised dealers in small towns who have been assigned more cars by their manufacturers than they can readily dispose of in their localities. Rather than sell these cars in the localities at less than the list prices established by the manufacturers, or to different purchasers at different prices or lose their franchises with the manufacturers for failure to sell the quota of vehicles assigned to them, they will dispose of cars to the Company for something less than the list prices, but sufficient to recover the capital invested in the vehicles and to realize a small profit. When the supply of motor vehicles is not plentiful and the demand great the Company purchases new cars from dealers in larger cities, including the city of Norfolk, at list prices or greater and then disposes of them at still higher prices. However, this does not necessarily mean that an individual purchaser pays more for an automobile acquired from the Company than if bought from an enfranchised dealer for the evidence shows that if he purchases from the latter he is usually required to trade in a used car for such sum as the enfranchised dealer is willing to allow him, which is often less than its value. If the individual does not consent to purchase on that basis, he is usually told that no new car is available.

In the past the Company has not advertised the cars that it sells as being new cars. The advertisements have described the automobiles as "driven less than so many miles" or "like new" or "sold with a 'new car guarantee' ", and there is no evidence

that any of its advertisements misled anyone into believing that the Company held a franchise with an automobile manufacturer or distributor.

Two dealers in Norfolk are enfranchised to sell Chevrolet automobiles and two to sell Ford cars. Only one dealer is enfranchised to sell Chrysler, DeSoto or Dodge cars, respectively, but each of these three dealers is also authorized to sell Plymouth automobiles.

There was evidence from one witness offered by the Commissioner to the effect that prior to the passage of this Act in 1944, many unlicensed, undesirable and unscrupulous persons were dealing in used cars. It is said that they perpetrated frauds upon members of the public who undertook to deal with them and that prior to the passage of the 1950 Amendment of the Act which defines new and used cars, there was a practice of purchasing cars that had been driven 500 miles or more, repainting them and turning back the speedometer and then advertising them for sale as new. He said that the provisions of this Act were intended to prevent those practices.

After hearing the evidence, the court was of opinion and found that no question of public safety, morals, health or general welfare was involved and thus the questioned parts of the Act exceeded and were beyond the State's police power and unconstitutional. It concluded that the assailed provisions of the statute, which are enumerated in the court's finding below, violated Sections 1 and 2 of Article I, and section 63, clauses 12 and 18, of Article IV of the Constitution of Virginia. The specific holding was that "the said Clause (4) of sec. 46-522 and the said section 46-535 of the Code of Virginia of 1950 constitute special legislation for a special class of people and the effect of the same is to create a monopoly in Virginia on the sale of all new automobiles, and the subject matter thereof is not a matter in which the public as individuals are concerned." The Commissioner was directed to issue to the Company a license which would authorize it to sell new as well as used motor vehicles. From that order, this appeal was awarded and the constitutionality of these two sections of the Code is now before us for determination.

Though the trial court held the provisions unconstitutional and violative of several provisions of our Constitution, we need

concern ourselves only with section 63, clause 18 of Article IV of the Virginia Constitution which reads as follows:

":The General Assembly shall not enact any local, special or private law in the following cases:

\*     \*     \*     \*     \*     \*

"18. Granting to any private corporation, association, or individual any special or exclusive right, privilege or immunity."

If the legislature may provide for the issuance of two classes of licenses, one of which permits the sale of new and used cars and the other, only the sale of used cars and then classify and define a new car as it is defined in section 46-503, then there is no prohibition against its defining a new car as one driven no greater distance than 4000 miles or titled no longer than ninety days, and thus further limit the field of activity of the unenfranchised dealer and broaden the field of operation of the enfranchised dealer. In fact, it is not amiss to say the evidence discloses that the definition of a new motor vehicle as it appeared in the amendment of 1950 when first offered for passage in the General Assembly was as stated next above.

In our opinion the legal question presented is: Do the provisions of the statute, tested by the language of the Constitution, grant to the several enfranchised dealers "any special or exclusive right, privilege or immunity" not given to others similarly situated? Stated otherwise, is the denial to unenfranchised dealers of the right to sell new automobiles and the grant of that right solely to enfranchised dealers a reasonable and natural classification, or is it so unjust, arbitrary, and discriminatory as to constitute what is termed "private or class" legislation?

What is a "special law" within the meaning of constitutional inhibitions against their enactment was well stated in *Budd* v. *Hancock*, 66 N. J. L. (37 Vroom) 133, 48 A. 1023. The definition there given has been repeated in *Van Cleve* v. *Passaic Valley Sewerage Com'rs.*, 71 N. J. L. (42 Vroom) 183, 184, 58 A. 571, and quoted with approval in *Iowa Motor Vehicle Ass'n.* v. *Board of Railroad Com'rs.*, 207 Iowa 461, 221 N. W. 364, and *Martin* v. *Commonwealth*, 126 Va. 603, 610, 102 S. E. 77, 724, and other decisions.

"A law is 'special in a constitutional sense when by force of an inherent limitation it arbitrarily separates some persons,

places or things from those upon which, but for such separation, it would operate.' " (126 Va. 610.)

Reasonably satisfactory as that definition is, we must still, in each instance, determine if the Act makes an "arbitrary separation" of "persons, places or things." For as stated by Judge Kelly at p. 610 in *Martin* v. *Commonwealth, supra,* whether there has been such an "arbitrary separation * * * must in the nature of things depend upon the person and subject of the particular act and the circumstances and conditions surrounding its passage."

It is said that this Act is intended and designed to prevent the perpetration of frauds upon and to the detriment of the public at large, yet no one is prevented from engaging in the sale of used cars. Its sole effect is to forbid to some the right to sell any or all new cars and by force of law grant that special right and valuable business privilege to a preferred few. And those select few are determined upon and limited to those to whom motor vehicle manufacturers, distributors or other dealers decide to award contract franchises.

In *Nelsen* v. *Tilley,* 137 Neb. 327, 289 N. W. 388, 126 A. L. R. 729, an act quite similar to this was under attack. Among other things, it provided as follows:

"Motor Vehicle Dealer's License: This license shall permit the licensee to engage in the business of selling or exchanging new and used motor vehicles or both: Provided, such license as it pertains to the sale or exchange of new motor vehicles shall be limited to such new motor vehicles as the licensee discloses in his application he is enfranchised to sell. * * *."

The court there said:

"* * * It cannot be seriously disputed that the motor vehicle industry has grown to huge proportions in both the state and nation. Motor vehicles, once luxuries, are now necessities. The handling of motor vehicles has become a complex business. The sale of new automobiles is closely tied in with the purchase, trade and sale of used cars. The possibilities of fraud upon the public have correspondingly increased. The elimination of harmful trade practices and dishonest dealings resulting in injuries to the purchasing public may have been, and undoubtedly was, a factor in passage of the act. * * *."

With that statement we are in accord and quite readily agree that reasonable and just regulations may be imposed upon all

dealers engaged in buying and selling used or new automobiles. But we are likewise in accord with the further holding in that case that the above-quoted portion of the Act which gave the exclusive right to sell new cars to enfranchised dealers was unconstitutional. Commenting upon that provision in the statute, the court said:

"In the instant case, the issuance of a license to sell new cars is limited to those enfranchised by the manufacturer of the new motor vehicles to be sold. The effect would be that the business of selling new cars would be monopolized by dealers enfranchised by the manufacturers. It constitutes an attempt to create a monopoly, a power that the legislature does not possess. The legislature cannot prohibit a citizen from engaging in the lawful business of selling and exchanging new motor vehicles by licensing the business and limiting the issuance of licenses to a favored few."

Upon its face this legislation gives special and exclusive privileges to one set or class of dealers which it denies to others who are equally fit and capable of dealing in the subject matter involved. Those fortunate enough to hold a contract franchise are allowed to sell new cars, but those holding no contract franchise are restricted and burdened in their undertaking by being prohibited from selling cars that they may have legally acquired. The Act also contains a further and additional vice. In practical operation it really forbids any individual to sell to anyone other than an enfranchised dealer a new car that he may have acquired but thereafter for any reason wishes to dispose of, for no other dealer can himself sell that vehicle.

It must be remembered that franchise holders (new car dealers) are permitted to buy and sell used cars as well as new vehicles. If it be or has been in the past a practice to repaint used cars and turn back their speedometers and dispose of them as new, we know of no human characteristic that prevents that fraudulent practice from being indulged in by the holder of a franchise or limits it solely to one who may be classified as a used car dealer. Integrity and honesty or the lack of those virtues is inherent in the individual and is not founded upon the character of license the Commissioner issues. Nor is the opportunity to perpetrate fraud in the sale of motor vehicles dependent upon whether a dealer is or is not the holder of a franchise when both classes of dealers are allowed to buy and sell

used cars. The enfranchised dealer has the same opportunity to commit the fraud by changing the outward appearance of a used car and selling it as new as does the individual or corporation who holds no such contract franchise. This legislation prevents only the used car dealer from selling such a car by forbidding him to sell any new car, while it leaves the few enfranchised dealers free to practice the frauds sought to be eliminated. The vice in and resultant unconstitutionality of this legislation is that it presupposes that unenfranchised dealers' constitute a class who alone are capable of fraudulent and sharp practice, and that dealers who hold franchises are immune from and incapable of committing the wrongs and dishonest acts sought to be guarded against.

However *bona fide* the assertion that this legislation is for the public welfare, and though earnest effort be made to impart to it the appearance of fairness and equality, its sole effect is to discriminate against all unenfranchised dealers and grant and secure special privileges to those few who are enfranchised, and this is done without any resultant benefit or protection to the general public.

■ ■ Acts of the legislature are presumed to be constitutional unless illegality appears upon their face. Every reasonable doubt in this respect must be resolved in favor of validity, and any natural, reasonable and appropriate classification will be upheld. Likewise, the need for classification and its reasonableness are primarily matters for legislative determination, yet wholly arbitrary selection can never be justified by calling it classification. The legislature may not, under the guise of police power, make unreasonable classifications and thus arbitrarily discriminate against and impose upon some hardships and grant special rights and privileges to others similarly situated. Whether or not the sale of automobiles be affected with a public use or interest, "justice under the law" will look beyond the mere language of the statute and if in reality the classification made be wholly unreasonable, arbitrary and oppressive the act must fall. *Quesinberry* v. *Hull,* 159 Va. 270, 165 S. E. 382; *Newport News* v. *Elizabeth City County,* 189 Va. 825, 55 S. E. (2d) 56; *Galloway* v. *Wolfe,* 117 Neb. 824, 223 N. W. 1; *State* v. *Baskowitz,* 250 Mo. 82, 156 S. W. 945; 50 Am. Jur., "Statutes", sec. 7, p. 21, and secs. 49, 50, pp. 65, 66.

If of that character, and we think the provisions of this Act in question are, its defenders may not shield it from the constitutional restrictions by the protective canopy of the State's police power.

There is nothing in the business of dealing in motor vehicles, the qualifications of those who engage in it, or the evils sought to be guarded against, which furnish any justification for the discriminatory classification made. Though the term "public welfare" be given its widest significance, plainly no such welfare is involved in provisions of a statute which permit an enfranchised dealer to sell a car driven less than 500 miles or titled less than thirty days, but denies that right and privilege to all others. The classification made and the restrictions imposed foster and protect the commercial interests of the enfranchised dealers but the classification is unnatural and unreasonable and the restrictions are not in the interest of the public health, morals, safety or general welfare.

For the reasons stated and on the ground indicated, we are of opinion that the judgment of the trial court should be sustained and it is accordingly affirmed.

*Affirmed.*