## Richmond

J. LINDSAY ALMOND, JR., ATTORNEY GENERAL OF VIRGINIA v. SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

April 26, 1957.

Record No. 4642.

Present, All the Justices.

The opinion states the case.

*Francis C. Lee, Assistant Attorney General (J. Lindsay Almond, Jr., Attorney General,* on brief), for the petitioner.

*George D. Gibson (John W. Riley; R. Allan Wimbish; Hunton, Williams, Gay, Moore & Powell,* on brief), for the respondent.

*(Oscar L. Shewmake; John C. Goddin; William M. Blackwell; David J. Mays; Henry T. Wickham; Shewmake, Gary, Goddin & Blackwell; Tucker, Mays, Moore & Reed,* for Richmond-Greyhound Lines, Inc., *amicus curiae).*

*(William C. Seibert,* for State Corporation Commission, *amicus curiae).*

*(Edward L. Breeden, Jr.; Robert.R. MacMillan; Breeden, Howard & MacMillan,* for the Elizabeth River Tunnel District, *amicus curiae).*

EGGLESTON, J., delivered the opinion of the court.

This is a petition for a writ of mandamus filed by the Attorney General of Virginia against the State Comptroller to determine the validity of the provision in Code, § 33-253, as amended by Acts 1954, ch. 319, p. 389, authorizing the State Highway Commission to provide "bus facilities for the transportation of passengers through or over" the bridge-tunnel project being constructed across Hampton Roads. When the Comptroller expressed doubt as to the constitutionality of the provision and his authority to issue warrants upon the State Treasury for the payment of the cost of such facilities, the present proceeding was filed pursuant to Code, § 8-714, to settle the

question and direct the issuance of the necessary warrants.

The facts are not in dispute. At the present time, pursuant to Code, § 33-228, as amended,[1] the State Highway Commission is constructing a bridge-tunnel project over and under the waters of Hampton Roads. The project includes a tunnel 1.4 miles in length under the water, from an island just west of Old Point on the north side of the channel to an island just west of Fort Wool on the south side of the channel. Connecting bridges lead from the north portal of the tunnel to the city of Hampton and from the south portal to Willoughby Spit in the city of Norfolk. From these respective terminals roads are under construction to connect with the State and federal highways. When completed the bridge-tunnel project will become an integral part of the State highway system, furnishing a convenient and quick way of passage between the cities of Newport News, Warwick, Hampton and the territory to the north, and the cities of Norfolk, Virginia Beach and the territory beyond to the south.

The cost of the project, $58,500,000, is to be financed by the sale of long-term bonds which are to be paid out of tolls charged for its use. Code, § 33-229, as amended by Acts 1954, ch. 319, p. 389.

At present the Department of Highways operates two ferries across Hampton Roads as connecting links in the highway system and paralleling the route of the bridge-tunnel project. One of these ferries runs from the city of Newport News on the north to Pine Beach near the Naval Operating Base in the city of Norfolk on the south, and the other from Old Point on the north to Willoughby Spit in the city of Norfolk on the south. Upon the opening of the bridge-tunnel project both of these ferries will be abandoned.

The record before us shows that in the construction of the bridge-tunnel project no provision is made for the passage of pedestrians. There are no walkways through the tunnel or along the approaches for their use, and they will not be permitted to use the crossing.[2]

At present 3,000 pedestrians per day use the ferries. These are mainly local patrons going to and from work. It is estimated that upon the completion of the project some of these will effect a cross-

---

[1] Acts 1950, ch. 110, p. 145; Acts 1954, ch. 578, p. 722; Acts 1956, ch. 158, p. 159.

[2] The record does not show the reason for this but it is said in one of the briefs that pedestrians are not permitted to walk through a modern vehicular tunnel because, (1) the additional cost of providing facilities for their use would make the cost of the tunnel prohibitive, and (2) such pedestrians constitute a serious traffic hazard requiring additional and costly traffic regulation.

ing by joining "group riding pools," leaving about 1,800 persons per day for whom some method of transportation over the project must be provided. Inasmuch as a traffic count shows that the peak of pedestrian traffic comes in the morning and afternoon, a flexible schedule of transportation will be necessary.

To meet this situation, Code, § 33-253, as amended by Acts 1954, ch. 319, p. 389, provides:

" * * * For the purposes of this § 33-253 the word 'project' shall, in relation to the project described in said paragraph (j), include * * * bus facilities for the transportation of passengers through or over said project if the Commission shall deem it advisable to * * * acquire such bus facilities; and the term 'cost of the project' shall, * * * include the cost of * * * providing bus facilities if the Commission shall deem it expedient to * * * acquire such facilities as a part of the project described in said paragraph (j). * * * "

Pursuant to this authority the State Highway Commission proposes to provide and put into operation a shuttle bus system running from a terminal on LaSalle avenue in the city of Hampton to a terminal either at Willoughby Spit or at Ocean View in the city of Norfolk. The proposed bus operation will extend a distance of from six to nine miles, depending upon the location of the Norfolk terminal. The location of these terminals will afford passengers using the bridge-tunnel project access to the local transit systems. Six busses will be required to provide the necessary service upon schedules varying with traffic conditions. A single garage, located in the city of Hampton, will be provided for the storage, servicing and maintenance of the equipment. It is estimated that the total cost of constructing the garage and acquiring the busses will amount to $315,000, and that thirty-one employees will be required to operate and maintain the bus system.

The prospectus of the project places the estimated annual cost of the proposed bus operation at $155,000, and the estimated revenue therefrom at $165,000. Thus passengers are to be transported over the project at little more than the cost of the operation.

The Richmond-Greyhound Lines, Incorporated, a motor vehicle common carrier, has been granted by the State Corporation Commission a certificate of public convenience and necessity to transport passengers and their baggage, mail and express between the cities of Norfolk and Warwick, serving also the cities of Hampton and New-

port News, by way of the bridge-tunnel project, effective upon its opening.

The question presented to us is whether the statutory provision authorizing the State Highway Commission to provide and operate this bus facility for the transportation of passengers through or over the project violates Section 185 of the Virginia Constitution. The pertinent portion of that section reads thus:

"Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation, nor shall the State, or any county, city, or town subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its work; *nor shall the State become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work;* nor assume any indebtedness of any county, city, or town, nor lend its credit to the same; * * * ." (Italics supplied.)

We are particularly concerned with the interpretation and application of the italicized portion of the section. The precise question presented is whether the State Highway Commission, an arm of the State, may acquire and operate this proposed bus facility, or whether such acquisition and operation must be left to private enterprise.

The case has been ably briefed and argued on both sides. The position of the Attorney General, that such proposed bus operation does not violate the constitutional provision, is supported by the *amicus curiae* brief of the Elizabeth River Tunnel District, which operates a similar bus facility through the Norfolk-Portsmouth tunnel.

The position of the Comptroller, that such proposed bus operation does violate the constitutional provision, is supported by the *amicus curiae* briefs of the State Corporation Commission and the Richmond-Greyhound Lines, Incorporated.

It is argued by and on behalf of the Attorney General that the proposed bus operation is not within the spirit and purpose of the restrictive provision in Section 185; that in engaging in such operation the State is not engaging in or carrying on a "work of internal improvement" within the meaning of the section, but is performing a governmental function incidental and necessary to the operation of the bridge-tunnel project which is a link in the State highway sys-

6

tem. Moreover, it is said, this proposed bus facility is by the terms of Code, § 33-253, as amended, made a vital part of the project itself and without which the project, as an essential link in the State highway system, will be incomplete in that it furnishes no facilities for the accommodation of pedestrians. Hence, it is said, the proposed bus facility is a part of the *public road* itself and as such is expressly excluded from the restrictive provision.

It is argued on behalf of the Comptroller that the constitutional restriction is broad and inclusive, with only two exceptions, "public roads and public parks"; that the proposed bus facility is not a part of the State's "public roads"; that the historical background of and reasons for the adoption of the section show that one of its plain purposes is to prohibit the State from engaging in the public transportation business and other public utility businesses, and to leave such businesses to private enterprise. Therefore, it is said, the proposed bus operation violates the letter and spirit of the restrictive provision.

■ It is an elementary principle of constitutional law that the General Assembly has plenary power except so far as restrained by the Constitution of this State and the Constitution of the United States. It is only where an act is plainly repugnant to some constitutional provision that the courts can declare it null and void. If there be reasonable doubt whether the act violates the fundamental law, that doubt must be resolved in favor of the act. *Almond v. Gilmer*, 188 Va. 822, 834, 51 S. E. 2d 272, 276.

■ The restrictive provisions of Section 185 were first incorporated in our fundamental law by their inclusion in the Constitution of 1869, where they appear as Sections 12, 14 and 15 of Article X. Section 15, the forerunner of that portion of Section 185 with which we are here concerned, read thus: "The state shall not be a party to, or become interested in, any work of internal improvement, nor engage in carrying on any such work, otherwise than in the expenditure of grants to the state of land or other property."

The Constitutional Convention of 1902 revised and rewrote Section 15 of the prior Constitution to read: "nor shall the State become a party to or become interested in any work of internal improvement, except public roads, or engaged in carrying on any such work". Here the pertinent change was the addition of the words "except public roads". By the 1928 revision the language of the section was brought to its present form by the addition of "public parks" as a further exception.

In *Almond* v. *Day*, 197 Va. 782, 91 S. E. 2d 660, we pointed out the historical background and reasons for the adoption of these restrictive provisions in the Constitution of 1869. Prior to the adoption of that Constitution, the State of Virginia had freely extended its credit and aid to corporations engaged in developing and operating privately owned works of internal improvement, such as canals, turnpikes and railroads, in the hope that the success of such undertakings would bring prosperity and benefit to the public. As a result of this policy large obligations were incurred and severe losses suffered by the State. Faced with these facts, the Constitutional Convention resolved that the State should no longer lend its support to such undertakings but should leave them to private enterprise.[3]

The Debates of this Constitutional Convention further show that one of the underlying purposes of these restrictive provisions was to encourage and foster the construction of such works of internal improvement by private enterprise by prohibiting the State from competing in that field.[4]

But there is nothing in the history of the section to suggest that its purpose was to restrict or limit the State in the exercise of its governmental functions. From the origin of the Commonwealth, down to the present time, it has constructed many works of internal improvement which are incidental and necessary to the performance of its governmental functions. Among these are the State Capitol, Supreme Court—Library Building, State office buildings, numerous college buildings, and the like. Plainly each of these is a "work of internal improvement" according to the literal meaning of these words, and yet no one would seriously contend that any of these is within the constitutional prohibition.

In *Shenandoah Lime Co.* v. *Governor*, 115 Va. 865, 80 S. E. 753, this court held that the construction and operation of a plant for grinding limestone and other material suitable for road construction were not within the constitutional restriction, because the dominant purpose of the project was to provide for the custody, employment and maintenance of State convicts, a governmental function. 115 Va., at page 873.

It is argued on behalf of the Comptroller that in *Shenandoah Lime*

---

[3] Similar conditions led to similar constitutional restrictions in most of the other States. 152 A. L. R., Annotation, p. 495.

[4] See the remarks of Delegate James H. Clements, Chairman of the Committee which recommended the adoption of the provisions. Debates and Proceedings of the Constitutional Convention of the State of Virginia (1868), Vol. 1, p. 650.

*Co.* v. *Governor, supra,* 115 Va., at page 872, in defining a "work of internal improvement" we said that the term referred to "the channels of trade and commerce, such as turnpikes, canals, railroads, telegraph lines, including in more recent years telephone lines, and other works of a like *quasi* public character," thus indicating that the transportation of passengers is a typical work of internal improvement which the State may not carry on and in which it may not become interested. Yet, it is said, in acquiring and operating this bus facility the State Highway Commission, an arm of the State, is engaging in the business of transporting passengers contrary to the spirit and purpose of the constitutional restriction.

We may assume, without deciding, that under the restrictive provision of Section 185, as interpreted in *Shenandoah Lime Co.* v. *Governor, supra,* the State may not engage in the general business of transporting passengers over the State highway system. But the record here presents no such case. Nothing was said in *Shenandoah Lime Co.* v. *Governor, supra,* to indicate that the State may not engage in the transportation of passengers if that be necessary and incidental to the performance of a governmental function. Indeed, as has been said, the holding in that case was based upon the principle that the provisions of Section 185 are not restrictive of the State's exercise of its governmental functions.

The General Assembly in discharge of the mandate in Section 129 of the Constitution, that it "shall establish and maintain an efficient system of public free schools throughout the State," has authorized the transportation of pupils by busses to and from the schools, and the State contributes to the cost of such transportation.[5] No one would question that the furnishing of such transportation facilities is a governmental function incidental and necessary to the operation of an efficient public school system, and not within the restrictions of Section 185.

The authorities agree that in the construction, maintenance and operation of a highway system the State is performing a governmental function (25 Am. Jur., Highways, § 54, p. 369), and we so held in *Almond* v. *Gilmer, supra,* 188 Va., at page 836, 51 S. E. 2d, at page 277. Indeed, Section 185 recognizes that principle, for in express terms it excludes "public roads" from a "work of internal improvement" in which the State may not engage.

Counsel for the Comptroller concedes that the bridge-tunnel proj-

---

[5] See Code, § 22-72(10); § 22-139; Acts 1956, ch. 716, p. 1101, Item 143.

ect is a link in the State highway system and that the operation of the project is a governmental function.

In *Almond* v. *Gilmer, supra,* we held that the acquisition and operation of a ferry by the State Highway Commission are not within the restrictive provision of Section 185. That holding was based upon the principle that a ferry, like a bridge, is an extension of the public highway across the water which the State may acquire or construct and operate under its inherent governmental power. (188 Va., at pages 837, 838, 51 S. E. 2d, at pages 277, 278.) A ferry consists of a boat with its docks or terminals and the operation of the boat across the water. 22 Am. Jur., Ferries, § 2, p. 553.

In the present case, the bridge-tunnel project is an extension of the highway, partly over and partly under the water. But for the proper operation of the project, including the lighting, ventilation and drainage of the tunnel, the project will not be usable as a public highway. The regulation of traffic through the tunnel and the furnishing of facilities for a quick removal of disabled vehicles therefrom are likewise necessary adjuncts to a proper operation of the project. In the same manner, but for the proposed shuttle bus operation facility, or some similar facility, the project, as a portion of the public highway, will not be usable by pedestrians. Without such a facility pedestrians will be as helpless to cross Hampton Roads as they would be today with no ferryboat.

By constructing the bridge-tunnel project and furnishing the proposed bus operation, the State is merely substituting one essential link in the highway for an existing link. Without the operation of the ferryboat for the transportation of passengers and vehicles across the water, the highway would end at the water's edge. Without the operation of an adequate facility for the transportation of pedestrians over the bridge-tunnel project, the highway would end for them at the terminals of the project.

It is argued that since the Richmond-Greyhound Lines, Incorporated, has been granted a certificate to transport passengers as a common carrier over the bridge-tunnel project, there is no necessity for the State Highway Commission to undertake this service. It is not our function to decide whether it is a wise policy for the State to operate this facility or whether it should be left to private enterprise. The question presented to us is whether the General Assembly has the power to authorize the State Highway Commission, as an arm of the State, to conduct such an operation. We hold that it has.

We are not here concerned with an ordinary and usual transportation problem. This proposed bus operation will be under the exclusive control of the State Highway Commission, which will have at hand or near by vehicles adequate to meet the varying traffic conditions, and its schedules and charges will not necessarily be arranged on the basis of earnings.

Such a flexible bus operation for the accommodation of pedestrians is as necessary and vital to the proper operation of the bridge-tunnel project as the bus operation for the transportation of pupils is to the maintenance of "an efficient system of public free schools".

Moreover, if the State, in the operation of a ferry as a part of its highway system, may transport passengers by means of boats along and across the surface of the water from one terminal to another, it would be both illogical and unrealistic to say that in the operation of the bridge-tunnel project, as a part of the same highway system, the State may not transport passengers between like terminals by means of busses which run through the tunnel and under the same water. Both operations are incidental and necessary to the main purposes of the highway, both are in the exercise of the State's governmental functions, and not within the restrictive provision of Section 185.

Indeed, we agree with the Attorney General that the acquisition and operation of the proposed bus facility are just as much an integral part of the highway as are the acquisition and operation of a ferryboat. Without such an adequate bus facility the bridge-tunnel project, as an essential link in the State highway system, will be incomplete and fall short of its full purpose in that it provides no facilities for the passage of pedestrians over it.

For these reasons we hold that the provision in Code, § 33-253, as amended, authorizing the State Highway Commission to provide "bus facilities for the transportation of passengers through or over said project" is not violative of Section 185 of the Constitution.

Accordingly, the mandamus prayed for is awarded.

*Mandamus awarded.*

MILLER, J., dissenting.

The part of § 33-253, 1956 Cum. Supp., Code 1950, (Acts 1954, Ch. 319, at page 391) that authorizes State ownership and operation of the bus facilities is challenged as violative of § 185 of the Constitu-

tion, because it authorizes the State to become a party to, be interested in, or engage in carrying on work of internal improvement.

When the prohibitive provisions of § 185 were first adopted in the Constitution of 1869, they appeared as Article 10, §§ 12, 14, and 15, and public roads and public parks were not excepted from the general category of works of internal improvement. Recognizing them as internal improvements, the State did not thereafter construct or maintain them. However, in the Constitution of 1902 public roads were excepted from the prohibitive language, and upon amendment of that Constitution in 1928, public parks were excepted. These exceptions show clearly that public roads and public parks were deemed to be internal improvements, and their exclusion from the broad and prohibitive language was necessary to allow the State to construct, maintain and operate them. *State v. Babcock*, 161 Minn. 80, 200 N. W. 843.

It is conceded by the Comptroller that the construction and maintenance of the tunnel, bridges and approaches that make up and constitute a road across Hampton Roads is not violative of the Constitution. *Almond v. Gilmer*, 188 Va. 822, 51 S. E. 2d 272. However, it is asserted that the part of § 33-253, Acts 1954, Ch. 319, p. 391, that purports to authorize the Commission to acquire and operate bus facilities, *i.e.*, engage in the bus transportation business for the carriage of persons and property through and over the project as distinguished from the maintenance and operation of the tunnel, bridges and approaches, contravene both the letter and the spirit of the provision in § 185 that forbids the State to "become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work."

I am not unmindful that all Acts of the General Assembly are presumed to be constitutional unless the contrary is made plainly to appear. *Dean v. Paolicelli*, 194 Va. 219, 72 S. E. 2d 506; *Joyner v. Centre Motor Co.*, 192 Va. 627, 66 S. E. 2d 469; *Smith v. Commonwealth*, 75 Va. 904; *Savage v. Commonwealth*, 152 Va. 992, 147 S. E. 262; 17 M. J., Statutes, § 29, p. 273. Here, however, for good cause and by plain language prohibition against the State is made absolute and inclusive as to all work of internal improvement with but two exceptions, and they are specific. We must therefore determine (1) whether or not the maintenance and operation of busses and facilities for transportation of the public through and over this

Bridge-Tunnel Project constitutes "work of internal improvement," and if so, (2) do the busses and facilities maintained and operated by the Commission constitute a part of this unique stretch of public road comprising the tunnel, bridges and approaches which concededly the State may construct, maintain and operate.

What is "work of internal improvement" within the purpose of the prohibition as used in the Constitution, *i.e.*, what meaning did the framers of the Constitution intend to convey by the use of the term "internal improvement?"

The words used should be given the scope and accorded the meaning that the framers of the Constitution attributed to them, if no violence is done to the language employed.

"The purpose and object sought to be attained by the framers of the constitution is to be looked for, and the will and intent of the people who ratified it is to be made effective. *May* v. *Topping*, 65 W. Va. 656, 64 S. E. 848." *Dean* v. *Paolicelli, supra,* at 226.

The evils sought to be guarded against and the history of the development of works of internal improvement in Virginia referred to in *Almond* v. *Day*, 197 Va. 782, 91 S. E. 2d 660, and authorities and treatises cited, impel the belief that it was enunciation of a broad principle that the Constitutional Convention had in mind when it adopted §§ 12, 14, and 15, Article 10, of the 1869 Constitution and not prohibitive legislation against particular activities. That being true and the principle having been embodied in the fundamental law of the State, the language used should be given broad meaning and comprehensive application.

" 'The Constitution is not to be construed in a technical manner, but in ascertaining its meaning we are to consider the circumstances attending its adoption, and what appears to have been the understanding of the people when they adopted it,' and we then only announced a rule of interpretation which had been frequently adopted." *Bonsal* v. *Yellott, et al.,* 100 Md. 481, 60 A. 593, 594. *State* v. *Donald,* 160 Wis. 21, 151 N. W. 331; *State* v. *Kelly,* 71 Kan. 811, 81 P. 450.

In construing the term "internal improvements" in *Shenandoah Lime Co.* v. *Governor,* 115 Va. 865, 871, 80 S. E. 753, this court said:

"Each of our Codes, beginning with that of 1819, to and including the Code of 1887, have had chapters entitled 'Works of Internal Improvement.' In using this term in article 185, the late Constitutional Convention must be presumed, according to established rules

of construction, to have used the term only in the definite sense and meaning that had attached to it throughout the history of the State. Its meaning as thus defined and understood throughout the legislation of the State, and the decisions of her courts, has included and had reference to the channels of trade and commerce, such as turnpikes, canals, railroads, telegraph lines, including in more recent years telephone lines, and other works of a like *quasi* public character. In the past these works, designated as 'works of internal improvement,' were sometimes constructed and operated by the State, but generally by corporations composed of private individuals, which, because of the public character of their works, always enjoyed the power of eminent domain, owed duties to the public and were subject to State regulation. These corporations, because of the great need of such improvements at the time, and the difficulty attending the construction of such works, were generally encouraged by State aid, and it was not until the Constitution of 1869 that the State was inhibited from becoming a party to or interested in such works of internal improvement."

The object and prohibitive purpose of this provision now incorporated in § 185 of the Constitution are further disclosed by the Debates of the Constitutional Convention of 1869. When that Convention determined that the State should no longer invest in or compete with private enterprise in promoting or constructing works of internal improvement, it did so upon the recommendation of James H. Clements, delegate from the city of Norfolk, and the city of Portsmouth. Speaking as chairman of the committee on taxation and finance, on the recommendation of that committee, he said:

"* * * [B]ut taking into consideration the general fact that the State has up to this time derived no real benefit from any interests she had in any internal improvement, in connection with the other fact that capitalists are now to such an extent interested in building up marts of commerce at various points, we thought it wise to leave it to the individual interests of the country, believing that any enterprise hereafter mooted, if it possessed within itself genuine merits, would receive such support as would do away the necessity for the State lending her aid to it." 1 *Debates and Proceedings of the Constitutional Convention of the State of Virginia* (1868) 650.

The Attorney General reminded us that no facilities for pedestrian travel are afforded by the project through the tunnel, over the bridges and trestles, or would be used if provided because of the dis-

tance across Hampton Roads. He then called attention to the fact that vehicular transportation for those using the project is necessary and argues that furnishing this character of transportation is incidental to and thus a part of the conceded authority and power of the State to construct and maintain public roads. The majority opinion seems to adhere to this view. However, in later years we have heard much protest, and justly so, about constitutional amendment for seeming necessity and by judicial interpretation. Even if necessity to amend did exist, it should be accomplished only in the mode provided by law.

The history of Virginia shows that since the middle of the seventeenth century it has been a responsibility of governmental authorities to construct and maintain roads. I Henning's Statutes at Large, Act L (1632), p. 199, and Act IX (1657-58), p. 436. Over the years the State and its subdivisions have been active and solicitous of this governmental function. In legislation of January 5, 1786, entitled an "Act Concerning Public Roads," Revised Code 1803, Ch. 19, p. 26, elaborate provision was made for the construction and maintenance of public roads. It is common knowledge that throughout ensuing years many other acts were adopted authorizing and empowering the State and local governments to construct and maintain turnpikes, roads and highways. Yet in none of these acts that I have seen does it appear, nor has it been asserted, that the maintenance and operation of agencies for the transportation of passengers or property over these roads was deemed or thought to be a governmental function or responsibility, or incidental to maintenance of the road. We do not find that Virginia ever undertook to operate stage coaches, when that mode of travel was in vogue, or in later years provide vehicular transportation (busses) for the carriage of passengers or freight over its system of roads or highways maintained by local governments. The business of furnishing public transportation over the roads was undertaken and developed by private capital and became a major industry. St. Clair: *Transportation, Land, Air, Water*, 1942; MacGill: *History of Transportation in the United States Before 1860*, 1917.

The maintenance of roads or a highway system and the operation of transportation agencies along such roads or system are by nature distinctly different functions. Neither expediency nor necessity can blend and make of them one and the same undertaking, though here necessity on the part of the State to furnish transportation does not

exist for a concededly responsible and efficient common carrier stands ready to furnish the needed service.

In the majority opinion it is stated that 3,000 pedestrians use the ferries each day, and about 1,800 of them will use the busses when operated. The annual cost of the proposed bus operation is estimated at $155,000, and the estimated revenue is $165,000, thus leaving a profit of $10,000. No doubt the inference is that the margin of profit is small when considered with reference to the passengers to be transported. I am at a loss to understand what the State's margin of profit, meager though it be, in this business enterprise has to do with the constitutionality of the act. Although it be conceded that the profit is small, that merely tends to show that the bus operation is welfare in character which renders it but the more objectionable.

The majority opinion says that constructing and operating the terminal and bus system is a governmental function and likens it to the construction, maintenance and operation of the State Capitol, Supreme Court-Library building, and other similar buildings. There is, however, a vast difference between the maintenance of a road and operating a bus system thereon, and the maintenance of the State Capitol, Supreme Court-Library building, and like governmental facilities and functions. Historically, maintenance and operation of these buildings have always been governmental functions, but I have never known the State to furnish transportation to these buildings and facilities or charge the public a toll to go through them.

A fleet of busses by which individuals or property are transported over the roads is physically distinct from the road upon which the vehicles operate and move. Not for governmental or any other purpose do I find that a fleet of busses and the facilities incident and necessary to their maintenance and use have ever been deemed a part of the road or highway system or their operation thereon considered incidental to the authority to construct and maintain the road or highway upon which the busses travel.

"Authority to construct and maintain highways and authority to transport passengers by hire upon said highways are in their nature and have been in practice radically distinct. The latter authority does not pass as an incident to the grant of the former." *Attorney General, ex rel.* v. *Common Council of the City of Detroit*, 148 Mich. 71, 111 N. W. 860, 864.

No other enterprises more typically exemplify what constitute and are termed works of internal improvement within the meaning of a

constitutional prohibition such as that contained in § 185 than do public transportation agencies. The exception of roads from the prohibitive language does not indicate an intent to permit the State to operate busses or a bus system though the contemplated area of operation be comparatively limited and the character of the project be unique.

Street railway, railroads, canal boat systems, and bus systems all serve the same general purposes, and the clear object of the constitutional prohibition is to forbid the State to engage in or become interested in these non-governmental functions and activities. It is, I think, a dangerous departure from the principle proclaimed and a palpable evasion of the purpose and intent of § 185 to allow the State to maintain the necessary facilities and operate a bus system for the transportation of passengers and property over the public highways for compensation, but forbid it to operate a street railway.

The contemplated activity is not and never has been a governmental function. The bus system (its garage, busses and terminals) is a work of internal improvement, and its operation over the project is not incidental to the maintenance of the road, which is actually and historically separate from it; nor does its operation over the project make it a part of the road.

In my opinion, that part of the Act of 1954, Ch. 319, which undertakes to authorize and empower the Commission to acquire, maintain and operate bus facilities for the transportation of passengers through or over the Bridge-Tunnel System Project is violative of § 185 of the Constitution of Virginia and void. However, it is clear that this provision is distinct and severable from other parts of the act, and its elimination would not affect them.

"The rule is that an act may be valid in one part, and invalid in another, and if the valid is severable from the remainder, that invalid part may be ignored, if after such elimination the remaining portions are sufficient to accomplish their purpose in accordance with the legislative intent. Only if the void portion is the inducement to the passage of the act, or is so interwoven in its texture as to prevent the statute from becoming operative in accordance with the will of the legislature, is the whole statute invalid. Thus, when a part of an act is invalid but the remainder reflects the legislative intent and is complete in itself, then the remainder will be upheld." 17 M. J., Statutes, § 28, p. 270. *New* v. *Atlantic Greyhound Corp.*, *et al.*, 186 Va. 726, 43 S. E. 2d 872; *King* v. *County of Arlington*, 195 Va. 1084, 81 S. E. 2d 587.

The other parts of the act are clearly sufficient to accomplish their purpose in accordance with the legislative intent when this invalid provision is severed from them.

I am unwilling to ride the State Welfare Bus authorized by the majority opinion; I much prefer a bus operated by private enterprise, and think the writ of mandamus should be denied.