**ATLANTIC MACHINERY & EQUIPMENT, INC.,**
Plaintiff,

v.

**TIGERCAT INDUSTRIES, INC., Defendant.**

**No. CIV.A. 3:05CV804HEH.**

United States District Court, E.D. Virginia, Richmond Division.

April 14, 2006.

---

Bradfute Warwick Davenport, Jr., Troutman Sanders LLP, Richmond, VA, for Plaintiff.

Matthew David Green, Michael Robert Ward, Morris & Morris, Richmond, VA, for Defendant.

### MEMORANDUM OPINION

HUDSON, District Judge.

**(Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendant's Cross Motion for Summary Judgment)**

This case involves the alleged wrongful termination of a heavy equipment dealership agreement. Plaintiff contends that its dealership agreement with Defendant is unenforceable as written because its provisions are trumped by the Virginia Heavy Equipment Dealer Act ("the Act"), Va. Code. Ann. §§ 59.1–353,–363 (2001 & Supp.2005). The defendant counters that Plaintiff's volume of inventory does not meet the minimum jurisdictional requirements under the Act and, in the alternative, the Act, as applied, violates the Constitutions of the United States and the Commonwealth of Virginia. The case is presently before the Court on Defendant's constitutional claims and Plaintiff's pending Motion for Partial Summary Judgment. Both sides have submitted memoranda of law supporting their respective positions. Because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process, the Court will dispense with oral argument.

By previous Order entered on March 6, 2006, this Court deferred its ruling on the parties' cross motions for partial summary judgment pending resolution of a disputed issue of material fact. Based on the record presented, the Court was unable to determine whether Plaintiff customarily maintained a total inventory on hand, or in stock, on a regular basis exceeding $250,000. Proof of this threshold issue is determinative of whether Plaintiff is entitled to protection under the Act.

On April 11, 2006, the parties filed an Inventory Stipulation agreeing, with two (2) exceptions, that Plaintiff's total inventory of heavy equipment on a monthly basis was accurately reflected in the sworn Declaration of L. Darlene Spangler ("Ms.Spangler"). Based on an examination of corporate records, Ms. Spangler, who serves as Secretary–Treasurer of Atlantic Machinery, was able to determine Plaintiff's total inventory of new equipment and parts for all lines of heavy equipment on the last day of each month from October 1, 1999 to September 30, 2005. The written notice of termination at issue in this case was received by Plaintiff on July 14, 2005.

■ A review of Ms. Spangler's analysis of Plaintiff's records reveals an inventory

of heavy equipment and parts well in excess of the $250,000 statutory threshold for each of the thirty (30) months preceding the notice of termination. In fact, the inventory exceeded $500,000 for twenty-five (25) of those months and surpassed $1,000,000 four (4) times. Plaintiff clearly satisfies the statutory definition of a "dealer" under the Virginia Heavy Equipment Dealer Act and as a result, the requirements of the Act apply to the conduct of the parties.

As more particularly discussed in the Court's opinion of March 6, 2006, this is a dispute over the legal efficacy of the cancellation of a dealership agreement. In 1999, Plaintiff, Atlantic Machinery & Equipment, Inc. ("Atlantic"), entered into a written dealership agreement ("the Agreement") with Tigercat Industries, Inc. ("Tigercat"). Atlantic, a Virginia corporation with its principal place of business in Henrico County, is engaged in the business of selling and leasing heavy equipment at retail. Tigercat, a Canadian company headquartered in Ontario, Canada, manufactures heavy forestry and logging equipment.

Under the terms of the Agreement, Tigercat designated Atlantic as an authorized dealer of certain Tigercat machines and parts for a defined geographic area of "primary responsibility." Tigercat had no other direct sales outlets in Virginia. Its products were marketed almost exclusively through a dealership network, which is also responsible for providing parts and services for end users. Equipment manufactured by Tigercat was assembled in Ontario, Canada and shipped to Atlantic "free on board" Ontario.

On July 14, 2005, after serving as Tigercat's authorized representative for almost six (6) years, Atlantic received a written notice of termination effective September 13, 2005. The letter of termination did not provide the purported reasons for Tigercat's termination of the Agreement.

Distilled to its essence, the dispute before the Court turns on two (2) elements of the Agreement pertaining to its cancellation, namely, the temporal sufficiency and format of the notice of termination. The language of the Agreement permits either party to terminate, with or without cause, upon sixty (60) days written notice. The Agreement also specifies that all communications, including notice of termination, may be delivered by courier, fax or e-mail. In contrast, the Virginia Heavy Equipment Dealer Act requires written notice at least 120 days in advance of termination and further dictates that such notice must be sent by certified or registered mail. The discrepancies in these provisions are the core issues in this dispute.

Before deciding whether the notice of termination in this case satisfied the requirements of the Act, the Court will address Defendant's claim that the Act, as applied in this case, contravenes the dormant Commerce Clause of the United States Constitution and the "special laws prohibition" found in Sections 12 and 18 of Article IV of the Constitution of the Commonwealth of Virginia. For the purpose of resolving Defendant's constitutional challenge, there are no material facts genuinely in dispute.

Focusing first on Defendant's contention that the Act offends the Constitution of the Commonwealth of Virginia, this challenge appears to lack both factual and legal moorings. As the Virginia Supreme Court pointed out in *Benderson Dev. Co. v. Sciortino*, 236 Va. 136, 372 S.E.2d 751 (1988), "the special-laws prohibitions contained in the Virginia Constitution are aimed squarely at economic favoritism." Their purpose was to correct the perception that the General Assembly in the nineteenth century, "devoted an excessive amount of

its time to the furtherance of private interests and to counter the 'sway that moneyed interests were seen to hold over state legislatures at the turn of the century.'" *Id.* at 146–47, 372 S.E.2d 751 (internal citation omitted).

■ The court in *Benderson* further noted that the test for statutes challenged under the special laws prohibitions in the Virginia Constitution is that they must bear "a reasonable and substantial relationship to the object sought to be accomplished by the legislation." *Id.* at 149, 372 S.E.2d 751 (citing *Mandell v. Haddon*, 202 Va. 979, 991, 121 S.E.2d 516 (1961)).

The defendant contends that the Act "was designed to protect a specific group—existing new heavy equipment dealers in Virginia to the detriment of other heavy equipment dealers, potential dealers, and most importantly customers." (Def. Mot. Summ. J. at 9.) Although the Act purports to ensure a stable business climate for the supply and distribution of heavy equipment, and that such regulations are necessary to encourage and support industry and economic development, the defendant alleges that such goals further no legitimate state interest. The defendant argues that there was no specific legislative determination that a shortage of heavy equipment existed in Virginia or that the law would improve the supply of such products. Moreover, the defendant asserts that the Act does not protect all heavy equipment dealers, but simply appeases a single dealership.

■ Neither federal nor state law prohibits economic classifications that bear a reasonable and substantial relation to the object sought to be accomplished by the legislation. *Mandell*, 202 Va. at 991, 121 S.E.2d 516; *see also King v. Va. Birth–Related Neurological Injury Comp. Program*, 242 Va. 404, 409, 410 S.E.2d 656 (1991). The wisdom of adopting such classifications is primarily a question which resides with the General Assembly. "'If any state of facts can be reasonably conceived, that would sustain it, that state of facts at the time the law was enacted must be assumed.'" *Jefferson Green Unit Owners Ass'n v. Gwinn*, 262 Va. 449, 459, 551 S.E.2d 339 (2001) (citing *Martin's Ex'rs v. Commonwealth*, 126 Va. 603, 612–13, 102 S.E. 724 (1920)). Acts of the General Assembly enjoy a presumption of constitutionality and the burden of overcoming the presumption rests on the challenging party. *Benderson*, 236 Va. at 148, 372 S.E.2d 751. All doubts must be resolved in favor of an enactment's constitutionality. *Wayside Rest., Inc. v. City of Virginia Beach*, 215 Va. 231, 236, 208 S.E.2d 51 (1974).

■ A facial review of the Act reveals no basis for concluding that it is either unreasonable or arbitrary. The General Assembly determined that the Act was calculated to promote economic development, foster fair business relations and prohibit unfair treatment of dealers. Whether the Act achieves that objective or could be crafted differently to accomplish its intended purpose is irrelevant. In applying the test for constitutional firmness announced in *Jefferson*, it is not the role of this Court to second guess the judgment of the General Assembly. This Court's task is to determine whether or not, based upon the existing record, "[t]he party assailing the enactment" has demonstrated that "'it does not rest upon a reasonable basis, and is essentially arbitrary.'" *Jefferson*, 262 Va. at 459, 551 S.E.2d 339 (internal citations omitted). Aside from bare argument, the defendant offers no basis in fact or law to support its claim that the Act is unreasonable and arbitrary.

Moreover, the defendant's reliance on *Joyner v. Centre Motor Co.*, 192 Va. 627,

66 S.E.2d 469 (1951), is misplaced. In *Joyner*, the Supreme Court of Virginia struck down a statute which created an insurmountable hurdle to the establishment of new car dealerships. In effect, the statute disallowed the opening of any new car dealership which was not part of an existing franchise. The Supreme Court of Virginia found the legislative purpose to be transparent, namely, to protect existing dealerships from competitors. The immediate statute has no such effect. As the plaintiff appropriately points out, the Act at issue governs an entity's exit from the market, not its entry.

Lastly, the Court is unpersuaded that the Act is intended to protect a single dealership. This is a strained construction of the terms of the Act. By its clear language, the Act appears to protect all heavy equipment dealers who meet the jurisdictional prerequisites of the statute.

The Court therefore finds that the Virginia Heavy Equipment Dealer Act does not violate the special law provisions of the Constitution of the Commonwealth of Virginia. The Court will turn next to Defendant's Commerce Clause challenge.

Before turning to the merits of Defendant's Commerce Clause challenge, the Court must first address Plaintiff's argument concerning the application of the foreign Commerce Clause to this case. Plaintiff argues that because the defendant is a Canadian corporation, the commerce that is allegedly unfairly regulated by the Act is *international* commerce, not *interstate* commerce. As a result, Plaintiff contends that by failing to argue that the Act violates the foreign Commerce Clause, Defen-

dant has divested itself of standing to challenge the Act pursuant to the dormant Commerce Clause.[1] Defendant counters that because the Act affects both interstate and international commerce, this Court "should apply traditional Commerce Clause analysis to determine the Act's validity, yet hold the Act to [an] even stricter standard applicable to burdened foreign commerce." (Def. Reply at 11–12.) The Court is of the opinion that the international aspects of this case do not change the application of traditional dormant Commerce Clause principles.

■ The effect of state regulation on foreign commerce has primarily been addressed by the Supreme Court in relation to situations involving state taxation of foreign commerce. *See Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.*, 505 U.S. 71, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992); *Japan Line Ltd. v. County of Los Angeles*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). However, "[a]lthough the language of dormant *Commerce Clause* jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce." *Antilles Cement Corp. v. Anibal Acevedo Vila*, 408 F.3d 41, 46 (1st Cir.2005) (citing *Barclays Bank*, 512 U.S. at 310, 114 S.Ct. 2268.) In those cases in which a state regulation has an effect on foreign commerce, the Supreme Court has indicated that "additional scrutiny is necessary to determine whether the regulations 'may impair uniformity in an area where federal uniformity is essential,'

---

1. Although the plaintiff frames this argument in terms of "standing," the Court notes that "standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin,* 422

U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, standing does not implicate a party's ability to defend against a case or controversy. Accordingly, the Court will not conduct a traditional standing analysis.

or may implicate 'matters of concern to the whole nation ... such as the potential for international retaliation.'" *Pac. Nw. Venison Producers v. Smitch,* 20 F.3d 1008, 1014 (9th Cir.1994) (internal citations omitted); *see also Japan Line Ltd.,* 441 U.S. at 446, 99 S.Ct. 1813 ("When a State seeks to tax instrumentalities of foreign commerce, two additional considerations, beyond those articulated in [the doctrine governing the Interstate Commerce Clause], come into play.") However, in those cases in which a state regulation effects foreign commerce but are not matters of concern to the whole nation, the Court should apply traditional dormant Commerce Clause analysis. *Pac. Nw. Venison Producers,* 20 F.3d at 1014; *see also South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 100, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (using *Pike* balancing test to invalidate state law effecting foreign commerce).

In the case at bar, the parties do not argue, nor does the evidence suggest, that the regulation of heavy equipment dealers is an area where national uniformity is important or implicates matters of a concern to the whole nation. As a result, the Court will apply traditional dormant Commerce Clause analysis to the facts at hand.

■ The Commerce Clause of the United States Constitution provides, in pertinent part, that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const. Art. I., § 8, cl. 3. Congress's authority to regulate commerce pursuant to the Constitution inherently carries with it a prohibition to the states to refrain from enacting laws which impede the flow of interstate commerce. *See Cooley v. Bd. of Wardens,* 53 U.S. (12 How.) 299, 318, 13 L.Ed. 996 (1851). This authority, known as the dormant Commerce Clause, "has long been understood ... to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted.'" *Barclays Bank,* 512 U.S. at 310, 114 S.Ct. 2268 (quoting *S. Pac. Co. v. Ariz. ex rel. Sullivan,* 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)). The dormant Commerce Clause "limits the power of the States to erect barriers against interstate trade." *Dennis v. Higgins,* 498 U.S. 439, 446, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (quoting *Lewis v. BT Inv. Mgrs., Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)). However, this limitation on state power " 'is by no means absolute. In the absence of conflicting federal legislation the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected.'" *Star Scientific, Inc. v. Beales,* 278 F.3d 339, 355 (4th Cir.2002) (quoting *Lewis,* 447 U.S. at 36, 100 S.Ct. 2009).

■ Review of a dormant Commerce Clause challenge to a state statute requires a two tier analysis. *Brown–Forman Distillers Corp. v. N.Y. Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The first tier of analysis, referred to as the discrimination tier, is a "virtually *per se* rule of invalidity" and applies "[w]hen a state statute clearly discriminates against interstate commerce." *Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). When a statute is clearly discriminatory, the Court will apply strict scrutiny and the statute will be struck down unless the state demonstrates "that the discriminatory law 'is demonstrably justified by a valid factor unrelated to economic protectionism,' and that there are no 'nondiscriminatory alternatives adequate to preserve the local interests at stake.'" *Envtl. Tech. Council v. Sierra Club,* 98 F.3d 774, 785 (4th Cir.1996) (internal citations omitted.) If the state statute does not "clearly discriminate" but instead "regulates even-

handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental" a less strict scrutiny applies, known as the undue burden tier or the *Pike* balancing tier. *Yamaha Motor Corp. v. Jim's Motorcycle Inc.,* 401 F.3d 560, 567 (4th Cir.2005) (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844 (internal quotation marks omitted)). Under a *Pike* analysis, a nondiscriminatory statute with only an incidental effect on commerce "will be upheld unless the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits." *Id.* The Supreme Court has acknowledged that "there is no 'clear line' separating close cases on which scrutiny [or which tier of analysis] should apply." *Wyoming,* 502 U.S. at 455 n. 12, 112 S.Ct. 789.

■■■■ Under the discrimination tier, a statute clearly discriminates when it "discriminates facially, in its practical effect, or in its purpose." *Envtl. Tech. Council,* 98 F.3d at 785. A statute discriminates in its practical effect when it favors in-state economic interests over out-of-state economic interests, or when it has an extraterritorial reach such that it regulates commerce wholly outside the state's borders. *See Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080; *see also Healy v. Beer Inst.,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

Defendant first contends that the Act violates the dormant Commerce Clause because it directly regulates commerce wholly outside the Commonwealth of Virginia. Even though the relationship between Tigercat and Atlantic is governed by a dealership agreement entered into in Virginia, which regulates the sale of equipment in Virginia, Defendant asserts that the underlying transaction is purely extraterritorial. The genesis of Defendant's position

is its argument that legal title to the equipment is processed in Ontario, Canada—not Virginia.

In further support of this theory, Defendant cites *Dean Foods Co. v. Brancel,* 187 F.3d 609 (7th Cir.1999), for the proposition that "[c]ourts have recognized that a state cannot regulate a transaction for which title of goods passes outside of the state's border." (Def. Mot. Summ. J. at 17.) Defendant argues that *Dean Foods* and the present case are analogous because both involve the sale of goods to which title passed to the buyer outside of the state attempting to regulate the transaction. The defendant misinterprets the Supreme Court's holding in *Dean Foods.*

*Dean Foods* involved a constitutional challenge to Wisconsin's milk pricing regulations. Wisconsin farmers conducted what the court described as preliminary negotiations for the sale of milk with Illinois dairy plants. This included telephone contact and meetings with field representatives. However, the transaction was not complete until Wisconsin farmers transported their product to Illinois plants, and the contract was not final until the product had been examined and accepted in Illinois. As a result, the Court held that the contract was formed in Illinois and that Wisconsin could not regulate the price of milk sold in Illinois.

Contrary to Defendant's contention, the Court in *Dean Foods* did not invalidate the state regulation based solely on the location of the goods at the time legal title transferred to the buyer. Rather, the Court looked to the location of where title passed as only one factor in determining if a contract had been formed within Wisconsin. After reviewing the transaction, the Court determined that the contract was created and performed wholly in Illinois. *Dean Foods,* 187 F.3d at 620. Thus, the Court ruled that the Wisconsin statute vio-

lated the dormant Commerce Clause because it attempted to govern a contract that had minimal contractual connection to that state and in doing so, was regulating commerce occurring *wholly* outside the state's borders.

In the immediate case, Virginia is not attempting to regulate a contract occurring wholly outside the Commonwealth. The contract in question was entered into in the Commonwealth of Virginia and regulates the sale of equipment in Virginia. While it may be true that elements of the transaction occurred outside of the Commonwealth of Virginia, this does not necessarily deprive Virginia of its interest in regulating the transaction. "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional. If the transaction occurs 'within' the boundaries of the state, it is constitutional so long as the regulation furthers legitimate in-state interests." *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (1999) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 642–46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)). If the "elements of the transaction have occurred in [different states], . . . both states have an interest in regulating the terms and performance of the contract." *Id.* at 787. Clearly, Virginia has a legitimate interest in regulating contracts entered into within her borders, particularly those affecting the stability of its economy. The state's interest is magnified when the contract in question also involves conduct between the parties of an on going nature which also occurs within the state's borders.

Much of the defendant's characterization of the impact on interstate commerce of its interaction with Plaintiff evolves from the Agreement and not the Act. Contrary to the defendant's assertions, the Act in no way requires the defendant to sell its products to the plaintiff. Rather, this requirement is solely a creation of the Agreement, which the defendant negotiated and entered into freely. The Act merely requires the suppliers of heavy equipment to follow certain procedural requirements before terminating an agreement with a dealer. Otherwise, it was the defendant who defined the rules of engagement.

Defendant further contends that the Act is violative of the dormant Commerce Clause because "[t]he plain language of the Act makes it clear that it applies to any transaction of heavy equipment between a supplier and a dealer regardless of whether those two parties have a formal written dealership agreement." (Def. Mot. Summ. J. at 19.) While this may be true, it does not cause the Act to run afoul of the United States Constitution. The dormant Commerce Clause "limits the power of the States to erect barriers against interstate trade." *Lewis*, 447 U.S. at 35, 100 S.Ct. 2009. The fact that the Act does not require a written agreement to be in place before it is implemented, does not erect a barrier against interstate trade, and thus, in no way implicates the dormant Commerce Clause.

Defendant next argues that the Act violates the dormant Commerce Clause in its practical effect because it discriminates against interstate commerce and amounts to state sanctioned economic protectionism. The defendant identifies two (2) areas in which it claims the Act discriminates against out-of-state interests. First, the defendant claims that "by definition dealers are local [and] [c]onversely suppliers of heavy equipment are not." (Def. Mot. Summ J. at 20.) Thus they argue, the Act is a "one sided attempt" to favor local dealers over foreign suppliers. (*Id.*) The assumption underlying this argument lacks factual foundation. Even if correct, it is inconsequential. The Act cannot be con-

sidered economic protectionism when it effects both in-state and out-of-state suppliers equally. A statute discriminates in its practical effect when it favors in-state economic interests over out-of-state economic interests. *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080. No such bias or favoritism has been demonstrated in this case.

In the final analysis, the Virginia Heavy Equipment Dealer Act neither discriminates against interstate commerce facially nor in its practical effect. It treats those in-state and out-of-state equipment manufacturers and suppliers similarly.

■■■■ Having determined that the Act does not clearly discriminate facially or in its direct practical effect, the Court must now determine if it violates the second tier of the analysis. This facet of the review is governed by balancing the factors articulated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). *Pike* applies when a state law does not consciously discriminate against interstate commerce, but instead regulates evenhandedly and only indirectly effects interstate commerce. *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080. "Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on commerce is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. In applying the *Pike* balancing test, the Court should balance "(1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is 'clearly excessive' when weighed against these local benefits." *Star Scientific,* 278 F.3d at 357.

■■■■ The first task is to determine if the Act has a legitimate local purpose. If the Court finds a legitimate local purpose, "then the question becomes one of degree ... [a]nd the extent of the burden that will be tolerated will ... depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* at 356–57. "In determining whether a statute has 'a legitimate local purpose' and 'putative local benefits,' a court must proceed with deference to the state legislature." *Yamaha Motor Corp.,* 401 F.3d at 569 (internal citation omitted).

Tracing the legislative history of a Virginia statute is typically unilluminating. However, in adopting the Heavy Equipment Dealer Act, the Virginia General Assembly clearly delineated the purpose and reason for its enactment. Among the articulated objectives was the support of a "stable business climate" in order to "encourage and support industry and economic development in the Commonwealth" and to "define the rights and responsibilities of suppliers and dealers of heavy equipment; establish conditions for the continuation of heavy equipment dealerships; foster fair business relations between suppliers and dealers of heavy equipment; [and] prohibit unfair treatment of dealers of heavy equipment." Heavy Equipment Dealer Act ch. 73, 1988 Va. Acts 80. The Court finds that the Act has a legitimate and important local purpose, namely, the overarching objective of stimulating economic development by encouraging stability and consistency between suppliers and dealers of heavy equipment in the Commonwealth of Virginia.

On the other side of the ledger, the defendant offers a number of perceived burdens to be weighed against the local benefits of the Act. In analyzing the alleged burden on interstate commerce, it is important to carefully parse the effects of the Act from those of the underlying

Agreement. Much of the burdens advanced by the defendant to offset the benefits of the statute are the result of the terms Defendant chose to include in the Agreement.

The defendant maintains that the cancellation provisions of the Act, requiring 120 rather than 60 days written notice, burdens the free flow of goods in interstate commerce. According to the defendant, there are two (2) out-of-state dealers in heavy equipment who wish to expand sales operations into Virginia. The inability of the defendant to terminate its relationship with Plaintiff in a more expeditious manner, has delayed this expansion, and hence, fettered interstate commerce. Nothing in the Act prohibits out-of-state distributors from expanding operations into Virginia. The Act merely requires what the Virginia General Assembly has determined to be reasonable notice as a prerequisite to canceling an agreement with existing distributors. Moreover, the boundaries of Plaintiff's sales territory were staked out by the Agreement and not the statute. If the defendant wanted to limit the territory assigned for Plaintiff's sales operations to allow for other dealers, it could have done so in drafting the Agreement.

Next, the defendant contends that "[t]he Act increases the market power of Atlantic Machinery, Tigercat's only in-state Virginia dealer, without conferring any equivalent benefit on Atlantic Machinery's out-of-state competitors. [T]he practical effect of the Heavy Equipment Dealer Act is to protect the Virginia dealer, at the expense of the potential out-of-state dealers ...." (Def.'s Mot. Summ. J. at 21.) The fact that only one dealership is based in Virginia does not skew the analysis. The Act provides the same protection to all dealers in Virginia. The inability of out-of-state dealers to expand their operations into Virginia, and take advantage of the protec-

tion of the Act, is a direct result of the Agreement negotiated and drafted by the defendant. Moreover, in advocating its constitutional claim, the defendant appears to confuse the effect of the Act on his dealings with Plaintiff, with an effect on interstate commerce generally. As the Supreme Court pointed out in *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), "the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* at 127–28, 98 S.Ct. 2207.

In support of its undue burden argument, the defendant offers *Yamaha Motor Corp. v. Jim's Motorcycle Inc.*, 401 F.3d 560 (4th Cir.2005) as analogous. However, as Plaintiff notes, there are few similarities between *Yamaha* and the immediate case. The constitutionally offensive portion of the statute at issue in *Yamaha* disallowed the creation of any new motorcycle dealership franchises in the Commonwealth of Virginia—anywhere in the state, without giving notice to existing franchise dealers, who in turn had a right to protest that proposed dealership. This right of protest extended to geographic areas hundreds of miles from the existing dealer's assigned sales district. The Fourth Circuit found this geographically unbridled right of protest to be "overreaching in the extreme." *Id.* at 573.

The defendant identifies four (4) arguable similarities between the facts in *Yamaha* and those in the immediate case. In *Yamaha*, the Fourth Circuit found that the protracted administrative process resulting from the exercise of the overly broad protest rights contributed significantly to its findings that the act in that case was overly burdensome. The court noted in *Yamaha* that the *administrative process* could take years to complete. In contrast, the Heavy Equipment Dealers Act provides

for 120 days notice, which includes a 75 day period in which the dealer has the opportunity to cure, and the supplier has an additional fifteen (15) to renew his notice of termination. *See* Va.Code. Ann. § 59.1–355 (2001 & Supp.2005). According to the defendant, "the manufacturer is required to pursue a legal remedy, a process that could last years." (Def.'s Mot. Summ. J. at 23.) Unlike the Motorcycle Dealers Act in *Yamaha*, the Heavy Equipment Dealers Act provides for a relatively short and finite period for dispute resolution. The potentially protracted and arguably burdensome legal proceedings cited by Defendant are not a product of the Act, but are an outgrowth of generally available legal remedies.

Next, the defendant contends that the Act affords dealers large swath of territorial control similar to the geographic dimensions of the motorcycle dealers in *Yamaha*. In *Yamaha*, the constitutional flaw was the statutory entitlement of existing franchisees to block the establishment of a new franchise beyond the geographic bounds of their assigned marketing area. In the immediate case, any territorial control enjoyed by Plaintiff flows from the Agreement, not the Act.

Finally, the defendant contends that the Act is overly burdensome in that it establishes no time limitations on the dealer/supplier relationship, and it creates no right to exclude the dealer from selling other products. The Act addresses neither point. Assuming that these perceived burdens have even a remote bearing on interstate commerce, they are directly attributable to the Agreement.

After carefully reviewing the defendant's argument, this Court is hard pressed to find any burden on interstate commerce resulting from the Virginia Heavy Equipment Dealer Act. Assuming, arguendo, that the Act has some incidental burden, this Court finds that it is a legitimate function of the Commonwealth's police powers. It is clear that "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *S. Pac. Co.*, 325 U.S. at 767, 65 S.Ct. 1515. Furthermore, "[t]he state is entitled to exercise its police power in the manner it sees fit, so long as it is legislating constitutionally." *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1425 (4th Cir.1985). The Virginia General Assembly is legitimately "empowered to subordinate the franchise rights of ... manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 107, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978). The burdens imposed by the Heavy Equipment Dealers Act are clearly not excessive when comparing to the legitimate and important legislative purpose achieved by its enactment. The Court is also of the opinion that neither a shorter period of notice of cancellation nor a more convenient form of communicating such notice would achieve the legislative goals of the Act or have a lesser impact on interstate commerce.

Having determined that the Act does not violate the United States or Virginia Constitutions and that it governs the Agreement, the Court will now determine if the defendant's termination of the Agreement comported with the requirements of the Act.

Pursuant to Section 59.1–354 of the Act, a supplier of heavy equipment may not unilaterally terminate a contract with a dealer unless it fulfills certain statutory prerequisites. First, the supplier must no-

tify the dealer in writing of its intent to terminate the contract and its reasons for termination at least 120 days in advance of the termination. Second, the supplier must have "good cause" for the termination. *See* Va.Code Ann. §§ 59.1–354, – 355. The statute limits "good cause" to "withdrawal by the supplier ... of the sale of products in Virginia or dealer performance deficiencies ...." Va.Code Ann. § 59.1–354. The statute goes on to indicate that "dealer performance deficiencies include but are not limited to", the following:

"1.  Bankruptcy or receivership of the dealer;

2.  Assignment for the benefit of creditors or similar disposition of the assets of the dealer; or

3.  Failure by the dealer to substantially comply without reasonable cause or justification, with any reasonable and material requirement imposed on him in writing by the supplier ...."

*Id.*

██ Plaintiff argues that Defendant's termination of the Agreement failed to comply with the notice requirement of the Act. This argument stems from the fact that Plaintiff received a one (1) page letter from the defendant on July 14, 2005, indicating that the Agreement would be terminated as of September 14, 2005, a full 60 days shy of the 120 days required by the statute. Moreover, contrary to the plain language of the Act, the termination letter did not specify Defendant's reasons for the termination. As a result, the defendant's attempted termination is clearly in violation of the notice requirement of the Act.

██ In addition, Plaintiff contends that the defendant has failed to offer any evidence that its attempted termination of the dealership contract was based on "good cause" as required by the statute. Section 59.1–354(c) of the statute mandates that

"[i]n any dispute as to whether a supplier has acted with good cause as required by this section, the supplier shall have the burden of proof to establish that good cause existed." *Id.* In its Brief in Opposition and cross Motion for Summary Judgment, Defendant does not argue that "good cause" existed for the termination, rather, Defendant limits its argument to the constitutionality of the Act and its applicability to the Agreement. As a result, the record is unclear as to Defendant's motivation behind terminating the Agreement. Therefore, the existence of "good cause" for the termination remains a material question of fact for resolution by a jury.

In conclusion, this Court finds that the Virginia Heavy Dealer Equipment Act does not violate either the United States or Virginia Constitutions and fully governs the Agreement entered into by the parties. Furthermore, the Court finds that Defendant's attempted termination of the Agreement did not comport with the notice requirements of Sections 59.1–355 of the Virginia Heavy Dealer Equipment Act and was therefore invalid. Accordingly, Plaintiff's Partial Motion for Summary Judgment will be Granted and Defendant's cross Motions for Summary Judgment will be denied.

An appropriate Order will accompany this Memorandum Opinion.

### ORDER

**(Granting Plaintiff's Motion for Partial Summary Judgment and Denying Defendant's Cross Motion for Summary Judgment)**

THIS MATTER is before the Court on the parties' cross Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Both parties have filed memoranda of law in support of their

respective positions. For the reasons stated in the accompanying Memorandum Opinion, Plaintiff's Partial Motion for Summary Judgment is GRANTED and Defendant's cross Motion for Summary Judgment is DENIED.

The Clerk is directed to send a copy of this Order to all counsel of record.